10-0720-cv(L)& 10-1147-cv
Bodansky et al. v. Fifth on the Park Condo et al. & Romero et al. v. Borden East River Realty LLC

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2010

(Argued in Tandem:  January 10, 2011                    Decided: March 15, 2011)

_____

LOLA BODANSKY, MICHAEL SCHNEIDER, NICHOLAS DANELLIS,
DAVID BARSTOW, BRIAN R. SMITH, JOHN MCATEER, G. WILLIAM HUNTER,
ROBYN HUNTER, STEVE BERGEN, LYNNE SCHALMAN, POH L. ANG,
CAROLINA RODRIGUEZ, LING P. ANG, JKP, LLC, RICHARD D. MEADOW,

*Plaintiffs-Appellants*,

Nos. 10-720-cv, 10-987-cv, 10-997-cv,
10-1014-cv, 10-1023-cv, 10-1047-cv,
10-1051-cv, 10-2270-cv

v.

FIFTH ON THE PARK CONDO, LLC, EYTAN BENYAMIN, ROBERT EZRAPOUR,

*Defendants-Appellees*.

_____

DANIEL ROMERO, JOANN RAGUSA, WILLIAM LEE, SZUYU PAN, KYUNG YEOL
SHIN, LORA KAYE, JOHN GAENZLER, SARA MOSCOSO-GAENZLER, ANTHONY
ALLICINO, JULIE LIEVRE, DAVID LIEVRE, ZACK FERGUSON-STEGER,

*Plaintiffs-Appellants*,

No. 10-1147-cv

v.

BORDEN EAST RIVER REALTY LLC,

*Defendant-Appellee*.[*]

_____

_____

[*] The Clerk of the Court is directed to amend the official caption in Case No. 10-1147-cv
to conform to the listing of the parties above.

POOLER, KATZMANN, and WESLEY, *Circuit Judges.*

———————————————————

Defendants-Appellees, developers or agents who sold uncompleted condominium units to Plaintiffs-Appellants, claim that those sales are exempt from the disclosure requirements of the Interstate Land Sales Full Disclosure Act ("ILSA"), 15 U.S.C. §§ 1701-20, and therefore the Plaintiffs-Appellants cannot revoke their contracts. In particular, Defendants-Appellees argue that ILSA's 100-lot exemption, *id.* § 1702(b)(1), is determined as of the date 100 or more nonexempt lots in that subdivision have been or cannot be sold or leased. We disagree. Whether a lot is exempt under the 100-lot exemption is determined as of the time a purchaser or lessee signs a contract to purchase or lease that lot. Accordingly, the district courts' judgments in the tandem appeals are VACATED and the cases are REMANDED to the district courts from which they were appealed.

Lawrence C. Weiner, Wilentz, Goldman & Spitzer P.A., Woodbridge, NJ, *for* Plaintiffs-Appellants Lola Bodansky, Michael Schneider, Nicholas Danellis, David Barstow, Brian R. Smith, John Mcateer, G. William Hunter, Robyn Hunter, Steve Bergen, Lynne Schalman, Poh L. Ang, Carolina Rodriguez, Ling P. Ang, Daniel Romero, and Joann Ragusa.

Paul J. Hanly, Hanly Conroy Bierstein Sheridan Fisher & Hayes LLP, New York, NY, *for* Plaintiff-Appellant JKP, LLC.

Evan Matthew Janush, The Lanier Law Firm, PLLC, New York, NY, *for* Plaintiff-Appellant Richard D. Meadow.

Daniel A. Ross, Sandra J. Rampersaud, and Derek I.A. Silverman, Stroock & Stroock & Lavan LLP, New York, NY, *for* Defendants-Appellees Fifth on

the Park Condo, LLC, Eytan Benyamin, and Robert Ezrapour.

Bruce H. Lederman, Brian T. Sampson, and Eric R. Garcia, D'Agostino, Levine, Landesman & Lederman, LLP, New York, NY, *for* Defendant-Appellee Borden East River Realty LLC.

_____

POOLER, *Circuit Judge*:

This case requires us to determine the extent to which a federal consumer protection law, the Interstate Land Sales Full Disclosure Act ("ILSA"), 15 U.S.C. §§ 1701-20, protects individual buyers or lessees who purchase or lease lots in large, uncompleted housing developments. Defendants-Appellees, developers or agents who sold condominium units to Plaintiffs-Appellants, claim that those sales are exempt from the disclosure requirements of ILSA, and therefore the Plaintiffs-Appellants cannot revoke their contracts. In particular, Defendants-Appellees argue that ILSA's 100-lot exemption, *id.* § 1702(b)(1), is determined as of the date 100 or more nonexempt lots in that subdivision have been or cannot be sold or leased. We disagree. Purchasers and lessees are entitled to know at the time of contract signing, or at a statutorily-defined period thereafter, whether developers must provide them with a property report disclosing information about the lot. Whether a lot is exempt under the 100-lot exemption is determined as of the time a purchaser or lessee signs a contract to purchase or lease that lot. The 100-lot exemption is not determined at an uncertain date in the future when the developer actually sells or leases (or conclusively does not sell or lease) 100 or more nonexempt lots. Accordingly, the district courts' judgments in the tandem appeals are VACATED and the cases are REMANDED to the district courts from which they were appealed.

**I.**

**A.**

On April 5, 2007, Appellees Fifth on the Park Condo, LLC, Eytan Benyamin, and Robert Ezrapour (collectively, "Fifth") filed a New York State Offering Plan with the state attorney general, indicating that they intended to offer for sale 160 residential condominium units at 1485 Fifth Avenue in Manhattan, across from Marcus Garvey Park.

From June 2007 to May 2008, the Bodansky plaintiffs[1] signed contracts to purchase residential units in Fifth's condominium and paid deposits ranging from $28,085 to $167,520. Before contract signing, Fifth provided the Bodansky plaintiffs with the most recent New York State Offering Plan. Fifth concedes, however, that it did not file a statement of record for the condominium with the U.S. Department of Housing and Development ("HUD"), did not provide the Bodansky plaintiffs with a written property report before contract signing, and did not refer to ILSA or its requirements in the contracts signed by the Bodansky plaintiffs.

Within two years of signing their contracts, the Bodansky plaintiffs sent letters to Fifth, purporting to revoke and rescind their contracts under ILSA and demanding a refund of all money paid to Fifth. Fifth refused to rescind the contracts or return their deposits. The Bodansky plaintiffs then filed lawsuits against Fifth in the United Stated District Court for the

---

[1] "The Bodansky plaintiffs" refers to Plaintiffs-Appellants Lola Bodansky, Michael Schneider, Nicholas Danellis, David Barstow, Brian R. Smith, John Mcateer, G. William Hunter, Robyn Hunter, Steve Bergen, Lynne Schalman, Poh L. Ang, Carolina Rodriguez, Ling P. Ang, JKP, LLC, and Richard D. Meadow.

Southern District of New York, seeking rescission of their contracts, return of their deposits, interest, and attorneys' fees and costs.

On September 10, 2009, Fifth received a Temporary Certificate of Occupancy (TCO) for its condominium building. As of that date, 90 residential units in Fifth's condominium were subject to a contract of sale or had been sold.

On January 22, 2010, plaintiffs Bergen, Bodansky, and Schalman stipulated with Fifth that their claims could be resolved in a bench trial on their written submissions. Pending resolution of that lawsuit, the district court (Cote, *J.*) stayed the cases against Fifth that the other Bodansky plaintiffs brought in the Southern District of New York.

On January 29, 2010, the district court held that Fifth is exempt from ILSA's registration and disclosure requirements. Specifically, the district court found that because Fifth had sold fewer than 100 residential units before Fifth received a TCO, the remaining units qualified for ILSA's improved-lot exemption, and thus the Bodansky plaintiffs' units qualified for ILSA's 100-lot exemption. Therefore, the district court concluded that Fifth did not violate ILSA by failing to provide the Bodansky plaintiffs with a property report before they signed their purchase agreements. The district court specifically rejected the argument that ILSA's 100-lot exemption is determined as of the date a contract is signed to purchase or lease a lot. The district court then dismissed Bodansky, Bergen, and Schalman's claims and entered judgment for Fifth.

After issuing Orders to Show Cause why the cases brought by the other Bodansky plaintiffs should not be dismissed, the district court dismissed those cases as well, citing its *Bodansky* decision. The Bodansky plaintiffs timely appealed to this Court, arguing that the units

they purchased were not exempt from ILSA's registration and disclosure requirements at the time of their purchase.

**B.**

On September 11, 2007, Borden East River Realty LLC ("Borden") filed a New York State Offering plan with the state attorney general, indicating that it sought to sell 132 residential units, 26 roof terrace units, and 25 parking space units. Borden sought to sell condominium units in Hunters Point Condominium in Long Island City, New York. The Hunters Point project was promoted together with a similarly-named project, Hunters View Condominium, sponsored by 11/49 Condominium. On the same day the Hunters Point offering plan was filed, 11/49 Condominium filed a New York State Offering Plan for Hunters View with the state attorney general, indicating that it sought to sell 73 residential units,[2] 15 roof terrace units, and 37 parking space units.

From October 2007 to November 2008, the Romero plaintiffs[3] signed agreements to purchase uncompleted condominium units in Hunters Point and paid deposits ranging from $49,462 to $96,530. Borden does not dispute that neither it nor 11/49 Condominium filed a statement of record with HUD for Hunters Point or Hunters View. Nor does Borden dispute that

---

[2] In Borden's tenth amendment to its Hunters View offering plan, filed on or about March 2008, the number of residential units offered was reduced to 72, as two formerly offered units were combined into one unit.

[3] "The Romero plaintiffs" refers to Plaintiffs-Appellants Daniel Romero, Joann Ragusa, William Lee, Szuyu Pan, Kyung Yeol Shin, Lora Kaye, John Gaenzler, Sara Moscoso-Gaenzler, Anthony Allicino, Julie Lievre, David Lievre, and Zack Ferguson-Steger.

it did not provide the Romero plaintiffs with written property reports before contract signing and did not refer to ILSA or its requirements in the contract signed by the Romero plaintiffs.

Within two years of signing their contracts, the Romero plaintiffs notified Borden that they intended to rescind their contracts, alleging that Borden violated ILSA's disclosure requirements. Borden refused to rescind the Romero plaintiffs' contracts or return their deposits. The Romero plaintiffs then sued Borden in the United States District Court for the Eastern District of New York.

On February 17, 2009, Borden received a Temporary Certificate of Occupancy (TCO) for Hunters Point. At that time, 57 units were unsold and 75 had been sold, including one on the day Borden received the TCO. On March 12, 2009, 11/49 Condominium received a TCO for Hunters View. At that time, 47 units were unsold, two units were combined into a single unit, and 25 units had been sold, including one to a purchaser who purportedly acquired it to resell or lease.

On May 14, 2009, the district court (Ross, *J.*) ordered all pending ILSA matters against Borden to be referred to her. In January 2010, the parties filed cross-motions for summary judgment.

On July 15, 2009, HUD issued an advisory opinion finding the Hunters Point project was not exempt under the Act because its parking units and rooftop units were "lots" under ILSA. Two days later, on July 17, HUD issued another advisory opinion that did not include parking units and rooftop units in the calculation and determined that Hunters Point was exempt under ILSA. HUD did not explain its reasoning or the disparity between the advisory opinions.

On March 12, 2010, the district court decided the parties' cross-motions for summary judgment. First, relying in part on Judge Cote's opinion, the district court rejected the Romero plaintiffs' argument that the 100-lot exemption is determined at the time of contract signing for a lot. Rather, the district court held that a developer qualifies for the 100-lot exemption until it sells or leases 100 nonexempt lots. After aggregating the number of nonexempt units sold or leased as part of a common promotional plan at Hunters Point and Hunters View, the district court found that those projects had sold or leased only 98 nonexempt units by the time they received TCOs. The district court found that the units not yet sold or leased at the time Hunters Point and Hunters View received TCOs qualified for ILSA's improved-lot exemption. Thus, the district court held that both projects were exempt from ILSA's registration and disclosure requirements and granted Borden's motion for summary judgment. The Romero plaintiffs timely appealed.

## C.

Fifth and Borden do not dispute that (1) they did not provide Plaintiffs-Appellants with printed property reports in advance of signing; and (2) the condominium units purchased by Plaintiffs-Appellants are "lots" in a "subdivision" under ILSA. Nor do Fifth and Borden challenge the timeliness of Plaintiffs-Appellants' notices of revocation. Rather, the parties principally dispute whether ILSA's 100-lot exemption applies to the condominium lots at issue. Plaintiffs-Appellants argue that the exemption is determined as of the time of contract signing, and argue that at those times, Fifth and Borden's projects contained 100 or more nonexempt lots. Fifth and Borden seek to uphold the district courts' judgments, arguing that the 100-lot exemption applies until a developer in fact sells or leases 100 or more nonexempt lots.

-8-

## II.

### A.

In the 1960s, Congress held numerous hearings regarding the unscrupulous marketing and sale of undeveloped subdivided land, often sight-unseen, to investors in faraway states. As two contemporary scholars noted, "[t]he testimony laid bare an industry, ambitious and adolescent, actively engaged in marketing raw and semideveloped subdivided land to the 'sunset set' by means of the mails, magazines, newspapers, and personal or telephone solicitations." Ronald J. Coffey & James d'A. Welch, *Federal Regulation of Land Sales: Full Disclosure Comes Down to Earth*, 21 Case W. Res. L. Rev. 5, 6 (1969-70) (footnotes omitted) (hereinafter "Coffey et al., *Full Disclosure*"). "Untold thousands were being flimflammed into purchasing parcels which could not be inhabited without serious threat of death from either thirst or drowning." *Id.*

The most uncertain and risky sales, in terms of future development and use, were of large tracts of subdivided, undeveloped land. *Id.* at 7-8. Some such land was inhabitable, and other such land, though possibly habitable, would require an enormous investment by the developer and local government to make it so. *Id.* Moreover, developers' use of sight-unseen sales tactics, including mailings, telephone calls, and sales parties, provided ready opportunities for fraud. *Id.* at 8. Often, the developers' representations veiled the nature of the land, and the developers' control over the "legal technicalities" of the sale "shrouded" the quality of title. *Id.*

Existing laws, although able to deter and punish some abuses, were seen as deficient in critical respects. The mail fraud statutes, for example, did not reach common sales tactics not using the mail, and because considerable investigation was required to build a case for fraud,

"the transgressing promoter [could] strew a great deal of wreckage in his path before he is brought up short." *Id.* at 11. Some policymakers proposed to treat interstate subdivided land sales as transactions subject to existing securities laws. *Id.* at 12-13. For installment lot transactions, where the purchaser did not take title or possession of the property until it made the final installment payment, the developer essentially sold "a debt instrument coupled with a specious commitment to repay by means of specific property." *Id.* at 13. While there was some logic to this approach, two former chairs of the U.S. Securities and Exchange Commission suggested that many real estate transactions would not fall within existing securities laws. *Id.* at 12.

In 1965, in response to the perceived abuses detailed in the hearings, Senator Harrison A. Williams, Jr. introduced a bill that required full disclosure to buyers of subdivided land. Williams's bill, "to the amusement of some and the chagrin of others, was simply a truncated version of the Securities Act of 1933, adapted for application to the sale of lots." *Id.* at 19; *see also* 111 Cong. Rec. 27,310, 27,312 (1965) ("Explanation of S. 2672: This bill is based on the Securities Act of 1933 and many of its sections are identical to those in the 1933 act."). "The bill provided two basic levels of protection: first, liberalized fraud remedies; and second, a requirement for full disclosure (by way of registration and use of a prospectus)." Coffey et al., *Full Disclosure*, at 19. In 1967, Williams reintroduced the bill, with some minor changes (such as changing the terms "registration statement," "prospectus," and "investor" in various sections of the bill to "statement of record," "property report," and "purchaser," respectively), 113 Cong. Rec. 315, 323-24 (1967), although "the motif was still Securities Act, vintage 1933," Coffey et al., *Full Disclosure*, at 19.

In 1968, Congress passed an amended version of Williams' bill, now the Interstate Land Sales Full Disclosure Act ("ILSA"). Pub. L. 90-448, 82 Stat. 476 (1968). Its striking resemblance to the Securities Act of 1933 remained intact. *See Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Oklahoma*, 426 U.S. 776, 778 (1976) ("[ILSA] is based on the full disclosure provisions and philosophy of the Securities Act of 1933, which it resembles in many respects." (citation omitted)). ILSA, as enacted in 1968, exempted from its requirements subdivisions smaller than 50 lots. Pub. L. 90-448, § 1403(a)(1), 82 Stat. 476, 590 (1968).

In 1979, Congress considered amending ILSA. The House Committee on Banking, Finance and Urban Affairs reported that "the registration and disclosure procedures required by the Act" and HUD's enforcement activities "have succeeded in changing industry practices." H.R. Rep. No. 96-154, at 30 (1979), *reprinted in* 1979 U.S.C.C.A.N. 2317, 2346. However, the Committee also found that "problems continue as a result of the failure of developers to complete promised amenities, the use of the installment sales contract and the brief statute of limitations." *Id.* In addition, the Committee found that "small businessmen and persons who sell occasional lots from a larger inventory of land have been subjected to extensive regulatory requirements." *Id.* In response, the Committee suggested amendments designed to "balance the consumer's need for adequate protections and remedies with the small businessman's concern with over-regulation." *Id.* In addition to providing "improved remedies to assist defrauded consumers," the Committee proposed to add "several exemptions and a state certification procedure." *Id.* at 31.

Notably, the Committee proposed to exempt subdivisions smaller than 100 lots from the registration and disclosure provisions of ILSA. *Id.* at 31. On December 21, 1979, Congress

-11-

passed a slightly altered version of the House Committee's recommended amendments, including the exemption of subdivisions of less than 100 lots. Housing and Community Development Amendments of 1979, Pub. L. 96-153, 93 Stat. 1101 (1979).

**B.**

ILSA has changed little since 1979. The Act requires developers to submit "a statement of record" to HUD, and wait until such statement is "in effect" (at most 30 days, unless the statement is incomplete or inaccurate) before selling or leasing any nonexempt lot. 15 U.S.C. § 1703(a)(1)(A). In addition, with respect to nonexempt lots, it is unlawful:

> to sell or lease any lot unless a printed property report . . . has been furnished to the purchaser or lessee in advance of the signing of any contract or agreement by such purchaser or lessee . . . .

*Id.* § 1703(a)(1)(B). If a developer or agent sells or leases a nonexempt lot in violation of this disclosure provision, Congress provided that:

> such contract or agreement may be revoked at the option of the purchaser or lessee within two years from the date of such signing . . . .

*Id.* § 1703(c). Aside from the requirement that the purchaser revoke within 2 years of signing and bring suit (if necessary) within 3 years of signing, Congress provided no statutory affirmative defenses in favor of the developer. Congress gave the purchaser an exclusive option to exercise her right to void the contract, upon showing that she signed the contract before receiving a property report.

However, ILSA's registration and disclosure requirements do not apply to all lots sold or leased. ILSA provides exemptions from the registration and disclosure sections of the Act, *id.*

-12-

§ 1702(b), and from all parts of the Act (including the fraud provisions), *id.* § 1702(a). The 100-lot exemption, at issue in this case, exempts from ILSA's registration and disclosure requirements:

> the sale or lease of lots in a subdivision containing fewer than one hundred lots which are not exempt under subsection (a) of this section . . .

15 U.S.C. § 1702(b)(1). This provision explicitly allows a developer to combine the 100-lot partial exemption with the full exemptions in Section 1702(a). A full exemption relevant here is the improved land exemption, which exempts from ILSA:

> the sale or lease of any improved land on which there is a residential, commercial, condominium, or industrial building . . . .

15 U.S.C. § 1702(a)(2).

That is, if some lots in a subdivision qualify for the improved land exemption, and the remaining number of nonexempt lots in the subdivision is less than 100, then ILSA's registration and disclosure provisions do not apply to the sale or lease of a lot in the subdivision. Here, defendants acknowledge that plaintiffs purchased their lots before those lots could be considered "improved land on which there is a residential, commercial, condominium, or industrial building." 15 U.S.C. § 1702(a)(2). Therefore, if plaintiffs' lots are to be exempt under ILSA, enough non-plaintiff lots must have qualified for the improved lot exemption so that the subdivision contained fewer than 100 nonexempt lots. The parties do not dispute this conclusion. Rather, they disagree about when to determine a lot's eligibility for the 100-lot exemption – and thus when a purchaser learns whether the developer was obligated to provide a property report in advance of contract signing.

## III.

## A.

Both district courts below determined that ILSA's 100-lot exemption is determined not at the time of contract signing for a lot, but at some point in the future, when a developer in fact sells one hundred or more non-exempt units. *Bodansky v. Fifth on the Park Condo, LLC*, 732 F. Supp. 2d 281, 290 (S.D.N.Y. 2010); *Romero v. Borden East R. Realty LLC*, No. 09-cv-665, 2010 WL 5758981, at *6 (E.D.N.Y. Mar. 12, 2010). As a pure question of statutory interpretation, we review this decision de novo. *See Harris v. City of New York*, 607 F.3d 18, 21 (2d Cir. 2010).

Because HUD is charged with administrating ILSA, 15 U.S.C. § 1715, it has authority to issue appropriate regulations regarding ILSA, *id.* § 1718, and has indeed promulgated regulations regarding ILSA, 24 C.F.R. §§ 1710.1-1710.559, we first determine "whether Congress has directly spoken to the precise question at issue," *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). If so, "that is the end of the matter" because this Court "must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43.

## 1.

Pursuant to the 100-lot exemption, ILSA's registration and disclosure requirements do not apply to "the sale or lease of lots in a subdivision containing fewer than one hundred lots" that are not exempt under Section 1702(a). 15 U.S.C. § 1702(b)(1). Significantly, ILSA defines "subdivision" as:

> any land which . . . is divided or is proposed to be divided into lots
> . . . for the purpose of sale or lease as part of a common
> promotional plan . . . .

-14-

*Id.* § 1701(3). In turn, "common promotional plan" is defined as:

> a plan, undertaken by a single developer or a group of developers
> acting in concert, to offer lots for sale or lease . . . .

*Id.* § 1701(4).

The 100-lot exemption can be usefully rephrased using the above definitions provided by Congress. The sale or lease of a lot from land that, for the purpose of a common plan to offer lots for sale or lease, (1) is divided or is proposed to be divided into lots and (2) contains fewer than 100 nonexempt lots, is exempt from ILSA's registration and disclosure requirements.

That is, ILSA's 100-lot exemption is determined as of the time of "the sale or lease" of the lot. *Id.* § 1702(b)(1). At that time, it can be determined whether the subdivision – the land the developer divided or proposed to divide into lots – contains fewer than 100 lots. If the lot is part of "land which . . . is proposed to be divided into lots . . . for the purpose of sale or lease as part of a common promotional plan," and that proposed land division contains 100 or more lots that are not exempt under Section 1702(a), then the purchased or leased lot is not exempt and a property report was required to be provided "in advance of the signing." *Id.* §§ 1701(3), 1702(b)(1), 1703(a)(1)(B).

In the context of ILSA's 100-lot exemption, "the sale or lease" of a lot occurs on the date of signing a contract or agreement to purchase or lease the lot. *See, e.g.*, *Markowitz v. Northeast Land Co.*, 906 F.2d 100, 104 (3d Cir. 1990); *Yeomans v. Le Triomphe P'ship*, 884 F.2d 847, 848-49 (5th Cir. 1989); *Winter v. Hollingsworth Props., Inc.*, 777 F.2d 1444, 1449 (11th Cir. 1985); *Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1043-44 (10th Cir. 1980). The interlocking protections Congress provided in ILSA offer purchasers the ability to make an informed decision at the time they sign a contract to purchase or lease a lot. ILSA provides that the purchaser of a

nonexempt lot must receive a property report "in advance of the signing" of a contract, 15 U.S.C. § 1703(a)(1)(B), may revoke the contract "within two years from the date of such signing," *id.* § 1703(c), and may bring suit for failure to timely receive a property report within "three years after the date of signing of the contract of sale or lease," *id.* § 1711(a)(1). Although we find ILSA unambiguous in this regard, we note that HUD's regulations are in accord with our interpretation of "sale or lease," which the regulations define as "any obligation or arrangement for consideration to purchase or lease a lot directly or indirectly." 24 C.F.R. § 1710.1(b).

**2.**

Contrary to Defendants-Appellees' arguments, ILSA nowhere suggests that purchasers must wait some unknown length of time – perhaps years – until they learn whether the lot they purchased was exempt under ILSA's 100-lot exemption – and thus learn that they had no right to receive a property report and cannot revoke their contract.

First, the revocation right under Section 1703(c) runs for 2 years from the date of contract signing. The possibility of revocation would be of limited value to purchasers if they had to wait an indefinite length of time to learn whether they could revoke. We do not believe that Congress enacted this consumer protection statute intending that when the statute was violated a diligent injured party could not timely invoke the statute's remedies. Rather, the text of ILSA suggests that a purchaser would be able to determine, on the date of contract signing, whether she could revoke her contract because the 100-lot exemption did not apply.

Second, ILSA's statute of limitations provisions shows that the 100-lot exemption is determined at signing, and not after an event that happens at an indefinite point thereafter. In

-16-

particular, Congress provided two different statutes of limitations, depending on the type of claim.

ILSA provides a statute of limitations of "three years after the date of signing of the contract" for claims of, inter alia, selling or leasing a lot (1) without an effective statement of record; (2) without delivering a property report prior to contract signing; or (3) where the property report or statement of record contains an untrue statement of material fact or omits a material fact.  15 U.S.C. § 1711(a)(1), (b).

In contrast, the statute of limitations is "three years after discovery of the violation or after discovery should have been made by the exercise of reasonable diligence" for claims that, inter alia, a developer or agent (1) employed a device, scheme, or artifice to defraud; (2) obtained money by means of an untrue statement of material fact or an omission of a material fact; or (3) engaged in a transaction, practice, or course of business that would operate as a fraud or deceit.  *Id.* § 1711(a)(2).

In these provisions, Congress required that claims that could be discovered at signing or soon thereafter be brought within 3 years of signing.  *Id.* § 1711(a)(1), (b).  For claims that arose at an indefinite point in the future, Congress required that they be brought within 3 years after discovery of the violation or after discovery should have been made by the exercise of reasonable diligence.  15 U.S.C. § 1711; *see also* H.R. Conf. Rep. 96-706, at 88 (1979), *reprinted in* 1979 U.S.C.C.A.N. 2402, 2447 (summarizing provision now located at 15 U.S.C. § 1711).  Determining at contract signing whether the 100-lot exemption applies to a purchased or leased lot allows the purchaser or lessee to learn soon after signing whether she may revoke her contract if she did not receive a property report in advance of signing.  Such timing is most

-17-

consistent with the text of the exemption and with ILSA's 2-year revocation provision and 3-year statute of limitations.

In sum, neither ILSA's Section 1703(c) revocation provision nor its statute of limitations provision suggest that purchasers must wait an indefinite period after signing to determine whether the developer was required to provide a property report in advance of their purchase or lease of the lot.

**3.**

The parties dispute the impact of another ILSA provision, the twelve-month exemption. This partial exemption provides that ILSA's registration and disclosure requirements do not apply to:

> the sale or lease of lots in a subdivision if, within the twelve-month period commencing on the date of the first sale or lease of a lot in such subdivision after the effective date of this subsection, or on such other date within that twelve-month period as the Secretary may prescribe, not more than twelve lots are sold or leased, and the sale or lease of the first twelve lots in such subdivision in any subsequent twelve-month period, if not more than twelve lots have been sold or leased in any preceding twelve-month period after the effective date of this subsection . . . .

15 U.S.C. § 1702(b)(2).

That is, under ILSA's twelve-month exemption, a purchased or leased lot is exempt if 12 or fewer lots in the subdivision "are sold or leased" in a specified twelve-month period, and not more than 12 lots were "sold or leased" in a previous twelve-month period. 15 U.S.C. § 1702(b)(2). This provision allows a developer that is gradually selling a dozen or fewer lots per year in a subdivision to avoid ILSA's registration and disclosure requirements.

Fifth and Borden argue that this exemption shows that the district courts below, in determining whether a purchased or leased lot was exempt, correctly focused on the sale or lease of other lots in the subdivision. The twelve-month exemption clearly provides that a purchased or leased lot's exemption from ILSA depends on whether (and to what extent) other lots in the subdivision were "sold or leased." In contrast, the 100-lot exemption includes no such language. The exemption is satisfied when the purchased or leased lot was in a subdivision "containing" less than 100 nonexempt lots. If the purchased or leased lot is not exempt at contract signing, it will not be made exempt under the 100-lot exemption by the later sale or lease of other lots in the subdivision.

Although the twelve-month exemption exempts a purchased or leased lot based on sales or leases of other lots in the subdivision, Congress strictly limited the scope of the other relevant sales to a twelve-month period. This is well within the 2-year revocation period under Section 1703(c). With this explicit limitation, the twelve-month exemption allows every purchaser and lessee to learn, with enough time to exercise her right of revocation, whether her purchased or leased lot is exempt. The 100-lot exemption, by contrast, contains neither this explicit limitation, nor does it explicitly depend on future sales or leases of other lots in the subdivision.

We decline to equate the twelve-month exemption with the 100-lot exemption. In the same year and with the same legislation, Congress amended ILSA to include both exemptions. Housing and Community Development Amendments of 1979, Pub. L. 96-153, § 402, 93 Stat. 1101, 1123-24 (1979). Congress did so with different language appropriate for different aims, and we must give effect to Congress's unambiguously expressed intent. The twelve-month exemption exempts a lot sold or leased during a trickle of lot sales or leases in a subdivision.

-19-

Aware of the risks presented by quick sales of large numbers of unimproved lots, Congress provided that the exemption for a slow seller of a few lots would be determined within twelve months of contract signing.  In contrast, the 100-lot exemption exempts a lot sold or leased when the proposed land division contains a relatively small number of lots.  Congress determined that a purchaser has a greater need for disclosure when she buys or leases a lot in a subdivision containing a large number of unimproved lots.  Although the other lots may someday be sold or leased and improved, Congress required a property report "in advance of the signing" and provided a revocation right that began on "the date of such signing."  15 U.S.C. § 1703(a)(1)(B), (c).  As the text of ILSA indicates, Congress also required the 100-lot exemption to be determined as of the date of signing.  *Id.* § 1702(b)(1).

For substantially similar reasons, the Dictionary Act does not compel a different result.  The Act provides that "[i]n determining the meaning of any Act of Congress, *unless the context indicates otherwise* . . . words used in the present tense include the future as well as the present."  1 U.S.C. § 1 (emphasis added); *see Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 199-200 (1993).  Here, incorporation of the future tense into the 100-lot exemption, as urged by Defendants-Appellees, runs contrary to ILSA's revocation and statute of limitations provisions.  In short, the definition supplied by 1 U.S.C. § 1 does not fit within this statutory scheme.  *See Rowland*, 506 U.S. at 200.  Consequently, this argument is rejected.

**4.**

In sum, the text of ILSA unambiguously provides that the 100-lot exemption is determined as of the date a purchaser signs a contract or agreement to purchase or lease a lot.  Because "Congress has directly spoken to the precise question at issue," we need not determine

the level of deference, if any, to provide HUD's interpretations of ILSA's 100-lot exemption, as stated in HUD's regulations, interpretive guidelines, and advisory letters. *Chevron*, 467 U.S. at 842.

## IV.

Borden requests that we "apply basic concepts of equitable jurisprudence" to deny relief to Plaintiffs-Appellants. Def.-Appellee's Br. 60. Borden argues that Plaintiffs-Appellants have "buyer's remorse" and "are in no way, shape or form the types of purchasers which ILSA was enacted to protect in the first place." *Id.* at 62-63. Borden proposes that "equity should not aid people who under such circumstances [of changes in the economy] make no allegations of fraud." *Id.* at 64.

We decline Borden's request. The statutory text enacted by Congress is clear and unambiguous. Congress enacted a registration and disclosure scheme for certain interstate land sales – modeled on the Securities Act of 1933 – and provided that if a developer violated the disclosure requirement, then the purchaser could revoke the agreement within 2 years of contract signing. Pointedly, Congress gave purchasers an exclusive right to revoke and did not provide for affirmative defenses other than the revocation and limitations periods. To the extent Borden questions the wisdom of Congress's statutory scheme, we note that Congress enacted a strict-liability revocation provision to (1) ensure that registration and disclosure in fact occurs, (2) limit the costly oversight of federal agencies into an activity traditionally regulated by state and local governments, and (3) allow unsophisticated purchasers to enforce their rights. Congress passed ILSA at a time when mail fraud statutes and common law fraud doctrines appeared ineffective to check the abuses in the land sales industry, in part because both required plaintiffs to show

-21-

reliance and quantify damages as a result of a developer's material misrepresentation or omission. Borden, by seeking to graft such a requirement onto ILSA, would disregard a key reason Congress enacted ILSA.

We note, however, that we are not unsympathetic to Defendants' claims that developers could be burdened by two sets of disclosure regulations for condominium sales. State disclosure laws and regulations could substantially overlap with ILSA's disclosure requirements, without providing additional protection for consumers. However, Congress was aware of such a possibility and explicitly provided a solution, allowing states to request HUD to certify that the state's disclosure requirements are "at least substantially equivalent" to ILSA's disclosure requirements or otherwise "provide sufficient protection for purchasers and lessees" with respect to such matters. 15 U.S.C. § 1708(a); *see also* 24 C.F.R. § 1710.500(a) ("The purpose of State Certification is to lessen the administrative burden on the individual developer, arising where there are duplicative state and federal registration and disclosure requirements, without affecting the level of protection given to the individual purchaser or lessee."). If a state is certified under Section 1708 of ILSA, a developer selling or leasing nonexempt lots in that state could use the required state disclosures to fulfill ILSA's statement of record and property report requirements for those sales or leases. 15 U.S.C. § 1708(b). In sum, to the extent that ILSA and state-law registration and disclosure requirements are duplicative, Congress provided a solution in Section 1708 of ILSA. To the extent that Defendants still have concerns, their recourse is to Congress, not to this Court, which is bound to adhere to the meaning of an unambiguous statute.

**V.**

We hold that under ILSA, a lot's eligibility for the 100-lot exemption is determined as of the time a purchaser or lessee signs a contract to purchase or lease that lot. Absent a clear and undisputed record, we allow the fact finders below to make the necessary factual determinations in the first instance.

**CONCLUSION**

For the foregoing reasons, the district courts' judgments in the tandem appeals are VACATED and the cases are REMANDED to the district courts from which they were appealed.