William I. DALZELL; Devon C. Purdy; Sam Properties V, LLC, a Colorado limited liability company; Gregory Haller; Pamela Haller; Cindy Rogers; Ronald Kolligian, Plaintiffs–Appellants,

v.

RP STEAMBOAT SPRINGS, LLC, a Delaware limited liability company, Defendant–Appellee,

and

Trailhead Lodge at Wildhorse Meadows, LLC, a Colorado limited liability company, Defendant.

No. 13–1440.

United States Court of Appeals, Tenth Circuit.

March 24, 2015.

Wendy Cooper Fostvedt, Fostvedt Legal Group, LLC, Basalt, CO, for Appellants.

Elizabeth L. Harris, Law Office of Elizabeth L. Harris, LLC, Denver, CO (Lawrence Zavadil, Husch Blackwell, LLP, Denver, CO, with her on the brief), for Appellee.

Before LUCERO, MURPHY, and McHUGH, Circuit Judges.

McHUGH, Circuit Judge.

## I. INTRODUCTION

This appeal asks whether the developer of a master-planned subdivision (master developer) is liable under the Interstate Land Sales Full Disclosure Act when a different developer sells units in a condominium project in the subdivision without providing a property report or making a statement of record available, as required by 15 U.S.C. § 1703(a)(1)(A)-(B). We conclude that because the master developer in this case, RP Steamboat Springs, LLC (RP), neither directly nor indirectly sold the condominium units at issue, it is not liable under § 1703(a)(1)(A)-(B). We therefore affirm the district court's ruling in favor of RP.[1]

---

1. Also before the court is RP's outstanding motion to strike six documents from volume II of appellants' appendix (specifically, documents 5, 6, 16, 19, 20, and 21) because those documents were never filed as part of the record in the district court. *See* 10th Cir. R. 30.1 (explaining that the appellant appendix contains excerpts of the record in the district court; *Utah v. U.S. Dep't of the Interior*, 535 F.3d 1184, 1196 n. 7 (10th Cir.2008) ("[N]ew evidence not submitted to the district court is not properly part of the record on appeal.").

## II. BACKGROUND

### A. *RP and the Wildhorse Meadows Master Development*

RP was formed in July 2005 for the purpose of developing a mixed-housing, master-planned subdivision in Steamboat Springs, Colorado, called Wildhorse Meadows. In July 2006, RP entered into an agreement with the City of Steamboat Springs to develop Wildhorse Meadows. The development agreement contemplated that Wildhorse Meadows would consist of eight parcels, each originally owned by RP, to be developed in phases and to consist collectively of approximately five hundred residential units.

RP engaged the services of two companies to assist in the development and marketing of Wildhorse Meadows. First, RP hired a management company, Resort Ventures West, Inc. (Resort Ventures), which was authorized to implement and oversee RP's development strategies. Resort Ventures acted primarily through its officers David Hill and Brent Pearson and its employee Mariana Ishida, each of whom was authorized to sign agreements and other documents on RP's behalf.

RP also hired a listing agent, S & P Destination Properties (S & P Properties). RP entered into an Exclusive Listing and Marketing Agreement (Listing Agreement) with S & P Properties for the marketing of the Wildhorse Meadows master-planned community. Under the Listing Agreement, the marketing of each of the eight parcels in Wildhorse Meadows would be governed by the Listing Agreement and by a separate project agreement between S & P Properties and the owner of the

parcel. In the event RP sold a parcel to a different developer, the Listing Agreement allowed RP to assign its rights in that particular project agreement to the new owner of the parcel.

### B. *Trailhead Lodge and Trailhead LLC*

One of the eight parcels in the Wildhorse Meadows master development, the Trailhead parcel, was designated for the development of a condominium complex called Trailhead Lodge. As master developer and initial owner of the Trailhead parcel, RP engaged in a variety of marketing activities through its listing agent, S & P Properties, for the Wildhorse Meadows development as a whole and for Trailhead Lodge specifically. For example, S & P Properties created a website for Wildhorse Meadows that contained information about Trailhead Lodge, prepared Wildhorse Meadows brochures that included information about Trailhead Lodge, and created separate marketing materials for each of the subdevelopments within Wildhorse Meadows, including Trailhead Lodge. Moreover, S & P Properties placed an ad in the winter 2006/2007 edition of Steamboat Magazine marketing only Trailhead Lodge.

On March 22, 2007, a group of investors formed Trailhead Lodge at Wildhorse Meadows, LLC (Trailhead LLC) for the purpose of developing the Trailhead Lodge condominiums. Like RP, Trailhead LLC hired Resort Ventures as its management company and S & P Properties as its listing and marketing agent. S & P Properties prepared a marketing plan at Trail-

---

RP also requests we disregard those portions of appellants' opening brief referencing the improperly included documents. Appellants agree that these documents were not properly filed in the district court and therefore should not be part of the record on appeal. Appel-

lants also agree that we should disregard any references to those documents in their brief, and they provide substitute sources that are properly in the appellate record. We therefore grant RP's motion to strike and proceed to the merits.

head LLC's expense, and the two entities unsuccessfully tried to negotiate a separate project agreement for the Trailhead Lodge. When those efforts failed, RP entered into a project agreement with S & P Properties concerning Trailhead Lodge (Trailhead Project Agreement) and then assigned all of its rights, title, and interest in the Trailhead Project Agreement to Trailhead LLC.[2] On July 27, 2007, RP transferred the Trailhead parcel to Trailhead LLC by special warranty deed.

## C. Preconstruction Purchase and Sale Agreements with Trailhead LLC

On July 25, 2007, two days before Trailhead LLC officially obtained ownership of the Trailhead parcel, William Dalzell and Devon Purdy, Gregory and Pamela Haller, Cindy Rogers, Ronald Kolligian, and SAM Properties V LLC (collectively, Buyers) each entered into substantially identical preconstruction purchase and sale agreements (Contracts) with Trailhead LLC. Under the Contracts, Buyers agreed to purchase condominium units in Trailhead Lodge upon completion of the Lodge's construction. Brent Pearson, acting in his capacity as an officer of Resort Ventures, signed the Contracts on behalf of Trailhead LLC. RP was not a signatory to the Contracts, but it was mentioned in the Contracts. Specifically, the Contracts stated the Trailhead Lodge condominiums were part of a master-planned, common-interest community known as Wildhorse Meadows to be developed by the master developer, RP. The Contracts also indicat-

ed that Buyers would become members of both the Trailhead Lodge Homeowners Association (HOA) and the Master HOA and that RP was responsible for constructing certain amenities in other parts of the Wildhorse Meadows subdivision to which Buyers would have access. Buyers each paid a deposit toward the purchase of their respective Trailhead Lodge units, ranging from $86,000 to $226,000.

At the time Trailhead LLC entered into the Contracts with Buyers, no one had filed a statement of record with the Department of Housing and Urban Development for Trailhead Lodge, nor were Buyers provided a property report, as required by the Interstate Land Sales Full Disclosure Act (Land Sales Act). See 15 U.S.C. §§ 1703(a)(1)(A)-(B), 1704, 1707. As a result of this failure, Buyers had the right to rescind the Contracts within two years after signing, which they did.[3] The now-insolvent Trailhead LLC has not returned the deposits Buyers paid under the Contracts.

## D. Procedural History

Buyers filed this action in the U.S. District Court for the District of Colorado against Trailhead LLC, RP, and S & P Properties. Among other claims, Buyers alleged Trailhead LLC, RP, and S & P Properties all qualify as developers under the Land Sales Act and that they violated the Land Sales Act by failing to file a statement of record and failing to provide a property report when Buyers purchased the condominium units. Buyers did not

---

**2.** RP assigned the Trailhead Project Agreement to Trailhead LLC in July 2007, but the parties backdated the assignment's effective date to April 15, 2007.

**3.** Buyers Dalzell/Purdy, the Hallers, and Kolligian sent timely notices of intent to rescind their Contracts. Buyers Rogers and SAM Properties failed to send timely notices of intent to rescind their Contracts, but the dis-

trict court ruled they would have rescinded, had the Contracts contained the required notice of their rescission right. The court therefore ruled that Ms. Rogers's and SAM Properties' Contracts were also effectively rescinded. No one has challenged this ruling on appeal; therefore, we view each Contract as lawfully rescinded.

bring a claim under the Land Sales Act's antifraud provision, 15 U.S.C. § 1703(a)(2), but did bring state breach of contract, negligent misrepresentation, and fraud claims. Buyers alleged damages in the amounts of their deposits and further asked the court to declare that they were permitted to rescind their contracts.

The district court subsequently granted Buyers' motion for summary judgment against Trailhead LLC on the Land Sales Act claims. Buyers and Trailhead LLC thereafter stipulated to the entry of judgment against Trailhead LLC, including a specific amount of damages due to each Buyer and an order rescinding each of the Contracts. Buyers later settled all claims against S & P Properties, and S & P Properties was dismissed from the case. The parties also stipulated to the dismissal without prejudice of Buyers' state law fraud and breach of contract claims, thereby disposing of all claims except Buyers' Land Sales Act claims against RP.[4] The remaining Land Sales Act claims do not include any allegations of fraud.

Buyers and RP agreed to submit those Land Sales Act claims to the district court on written briefs, supporting affidavits, and stipulated facts. In its ultimate findings of fact and conclusions of law, the district court ruled that RP was not liable under the relevant provisions of the Land Sales Act. Specifically, the district court determined that although RP qualified as a developer under the Land Sales Act, see 15 U.S.C. § 1701(5), RP did not exercise sufficient control over the sale of the condo-

minium units to qualify as a direct or indirect seller. Because the Land Sales Act makes it unlawful for a developer "to sell" real estate without providing a property report or statement of record, see 15 U.S.C. § 1703(a)(1)(A)-(B), the district court concluded RP was not liable for these deficiencies. Buyers timely appealed, and we exercise our jurisdiction under 28 U.S.C. § 1291.

## III. DISCUSSION

 Buyers challenge the district court's determination that although RP qualifies as a developer under the Land Sales Act, it is not liable under § 1703(a)(1)(A)-(B) (the disclosure provisions) because it did not directly or indirectly sell the condominium units. They first argue that RP's status as a developer alone makes it liable under the disclosure provisions. Buyers alternatively argue that even if RP's status as a developer is not enough to establish liability, RP is liable as an indirect seller of the condominium units. These challenges present questions of statutory interpretation, which we review de novo. *United States v. Manning*, 526 F.3d 611, 614 (10th Cir.2008). But we also review the district court's application of the statutory standard to the facts of this case, which is a mixed question of fact and law. *See United States v. Alvarez*, 731 F.3d 1101, 1105 (10th Cir. 2013), *cert. denied*, —— U.S. ——, 134 S.Ct. 1333, 188 L.Ed.2d 343 (2014) ("A mixed question exists when there is a dispute both as to inferences drawn from raw

---

4. It is not entirely clear why Buyers chose to exercise their right to rescind the Contracts. On appeal, Buyers do not state their reasons for rescinding. The dissent focuses on language from Buyers' affidavits submitted to the district court in support of their subsequently dismissed state fraud and breach of contract claims, indicating that the condominium units may have been smaller than promised and

that certain promised amenities had not yet been constructed. But none of this is relevant to the sole issue on appeal, which is whether RP can be held liable for the return of Buyers' down payments due to the failure to have a statement of record in effect and to deliver a property report to Buyers at the time they entered the Contracts with Trailhead LLC.

facts and as to the meaning of a statutory term." (quoting 5 C.J.S. *Appeal & Error* § 819)). We review mixed questions de novo "with the presumption of correctness continuing to apply to any underlying findings of fact." *Stillwater Nat'l Bank & Trust Co. v. CIT Grp./Equip. Fin., Inc.,* 383 F.3d 1148, 1150 (10th Cir.2004).

## A. Developer Liability Under § 1703(a)

■■■ "Any exercise in statutory interpretation must begin with an examination of the plain language at issue." *Tuckel v. Grover,* 660 F.3d 1249, 1252 (10th Cir. 2011). But "the meaning of statutory language, plain or not, depends on context." *In re Woods,* 743 F.3d 689, 694 (10th Cir. 2014) (internal quotation marks omitted). This contextual analysis requires us to consider the statute's intended purpose, which, in the case of the Land Sales Act, is "to prohibit and punish fraud in . . . land development enterprises." *McCown v. Heidler,* 527 F.2d 204, 207 (10th Cir.1975), *implied abrogation on other grounds as recognized by Anixter v. Home–Stake Prod. Co.,* 77 F.3d 1215, 1231 (10th Cir. 1996). And because the Land Sales Act "should be interpreted to attain that end," the Act "should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes." *Id.* (internal quotation marks omitted); *see also Edwards v. Valdez,* 789 F.2d 1477, 1482 (10th Cir.1986) ("[W]e must start with the assumption that legislative purpose is reflected by the ordinary meaning of the language used in the statute." (citing *United States v. Locke,* 471 U.S. 84, 85, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985))).

**5.** The district court ruled and the parties do not dispute that Wildhorse Meadows is a qualifying land development project, subject to the requirements of the Land Sales Act. And although RP's sale of the Trailhead par-

## 1. The Land Sales Act's Definition of Developer

■■■ Turning to the plain language, the Land Sales Act makes it "unlawful for any developer or agent" to engage in certain conduct when advertising and selling lots in qualifying land development projects.[5] 15 U.S.C. § 1703(a). Therefore, the threshold question for determining liability under § 1703(a) is whether a party qualifies as a developer or agent. The Land Sales Act defines a developer as "any person who, directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision." *Id.* § 1701(5). It defines agent as "any person who represents, or acts for or on behalf of, a developer in selling or leasing, or offering to sell or lease, any lot or lots in a subdivision." *Id.* § 1701(6). Under these definitions, a party will qualify as a developer if it engages in any of three types of conduct: (1) directly or indirectly selling or leasing lots, (2) directly or indirectly offering to sell or lease lots, or (3) directly or indirectly advertising for the sale or lease of any lots. And a party who engages in any of these types of conduct on behalf of a developer will qualify as an agent and will be subject to the same liability as the developer. But our plain language analysis does not end there.

## 2. Liability Under § 1703(a)

Instead, we turn to § 1703(a) and its list of specific activities in which agents and developers may not engage. These prohibited activities are:

cel to Trailhead LLC is exempt from the Land Sales Act requirements under 15 U.S.C. § 1702(a)(7), Trailhead LLC's sale of the condominium units to Buyers is not exempt.

(1) with respect to the sale or lease of any lot not exempt under section 1702 of this title—

(A) *to sell or lease any lot* unless a statement of record with respect to such lot is in effect . . . ;

(B) *to sell or lease any lot* unless a printed property report . . . has been furnished to the purchaser or lessee in advance of the signing of any contract or agreement . . . ;

(C) *to sell or lease any lot* where any part of the statement of record or the property report contained an untrue statement of a material fact or omitted to state a material fact . . . ; or

(D) *to display or deliver to prospective purchasers or lessees advertising and promotional material* which is inconsistent with information required to be disclosed in the property report; or

(2) with respect to the sale or lease, or offer to sell or lease, any lot not exempt under section 1702(a) of this title—

(A) to employ any device, scheme, or artifice to defraud;

(B) to obtain money or property by means of any untrue statement of a material fact, or any omission to state a material fact . . . ;

(C) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser; or

(D) to represent that roads, sewers, water, gas, or electric service, or recreational amenities will be provided or completed by the developer without stipulating in the contract of sale or lease that such services or amenities will be provided or completed.

*Id.* § 1703(a) (emphasis added).

As this list indicates, liability under each separate subsection of § 1703(a) attaches only to developers or agents who engage in the specified unlawful conduct. For example, subsections (a)(1)(A)-(C) each begin with the term "to sell or lease," expressly indicating that only those developers or agents who sell or lease lots may be subject to liability under those subsections. In contrast, subsection (a)(1)(D) makes it unlawful for a developer or agent "to display or deliver" advertising that is inconsistent with the information required to be in the property report. Therefore, under subsection (a)(1)(D), any developer who engages in inconsistent advertising will be liable, regardless of whether that developer also sold the subject lots. Similarly, subsection (a)(2), which covers fraudulent activities, imposes liability on any developer or agent who participates in fraudulent conduct. The term "to sell" does not appear in any of § 1703(a)(2)'s subsections, and therefore liability for fraudulent conduct does not hinge on whether the developer sold the subject lots.

The Fourth Circuit's recent case, *In re Total Realty Management, LLC,* is instructive on the significance of these distinctions. 706 F.3d 245 (4th Cir.2013). In *Total Realty,* the bankruptcy trustee of a debtor real estate developer filed suit against other real estate development companies seeking contributions for the debtor's liabilities under the Land Sales Act's antifraud provision. *Id.* at 250–51. Defendants argued that although they met the Land Sales Act's definition of developer, they could not be liable for the fraudulent scheme because they did not sell the lots at issue. *Id.* at 251–52. After the defendants transferred the action to the United States District Court for the Eastern District of Virginia, the district court dismissed the complaint for the reasons advanced by the defendants. *Id.* at 250. The Fourth Circuit reversed. The court based its analysis on the plain language of

the Act, comparing § 1703(a)(1)(A)-(C)—which use the term "to sell"—with § 1703(a)(1)(D)—which does not. *Id.* at 252. The court reasoned, "Congress limited liability under [subsections (A)-(C)] to the sellers of property." *Id.* But as to subsection (D), "Congress intended to hold advertisers and promoters liable for certain acts, even if they did not sell a property." *Id.*

The court went on to explain that § 1703(a)(2), the antifraud provision, is more like subsection (a)(1)(D) because none of its subsections include the phrase "to sell." *Id.* at 253. Therefore, unlike subsections (a)(1)(A)-(C), which apply only to sellers of the property, subsections (a)(1)(D) and (a)(2) "encompass[] entities that participated in the advertising and promotional efforts leading to a challenged real estate transaction, even if they ultimately were not party to the transaction." *Id.* at 253; *see also Nahigian v. Juno–Loudon, LLC,* No. 1:09CV725 JCC, 2010 WL 3418179, at *9 (E.D.Va. Aug. 23, 2010) (explaining that defendant could not be liable under subsections (a)(1)(A)-(B) where defendant, "as a non-owner of the property and non-seller of the property, was not aware that Plaintiffs were about to enter into the agreement, nor was [defendant] a party to the Purchase Agreement with standing to insist that certain disclosures be made in the Agreement"), *aff'd sub nom. Nahigian v. Juno–Loudoun, LLC,* 677 F.3d 579 (4th Cir.2012).

 We find the reasoning of the Fourth Circuit persuasive. Under our canons of statutory construction, "when Congress includes particular language in one section of a statute but omits it in another—let alone in the very next provision—[we] presume[] that Congress intended a difference in meaning." *Loughrin v. United States,* — U.S. ——, 134 S.Ct. 2384, 2390, 189 L.Ed.2d 411 (2014)

(internal quotation marks omitted); *see also Elwell v. Okla. ex rel. Bd. of Regents of Univ. of Okla.,* 693 F.3d 1303, 1309 (10th Cir.2012) (same). By including the term "to sell" in some of § 1703(a)'s subsections and not in others, Congress demonstrated an intent to distinguish between developers who sell lots and developers that are not involved in the ultimate real estate transaction. This distinction means that only seller-developers can be liable under § 1703(a)(1)(A)-(C). Had Congress intended for all developers to be liable under subsections (a)(1)(A)-(C), it would have omitted the term "to sell" as it did in subsections (a)(1)(D) and (a)(2). Instead, the plain language of § 1703(a)(1)(A)-(C) manifests Congress's intent to hold only those developers who "sell or lease" lots liable for violations of those subsections.

 The Land Sales Act itself does not define "sell." Therefore, we turn to the relevant regulatory definition in understanding the statutory meaning of this term. *See Toomer v. City Cab,* 443 F.3d 1191, 1195 (10th Cir.2006) (explaining that where a statutory term is ambiguous, "we must look to any relevant agency interpretation or definition and defer to the agency if it has based its definition on a permissible construction"); *Donner v. Nicklaus,* 778 F.3d 857 (10th Cir.2015) (looking to the regulatory definition of "lot" to interpret the Land Sales Act's use of the term). The relevant regulatory provision does not include a definition of the verb "to sell," but does define the related noun "sale" as "any obligation or arrangement for consideration to purchase or lease a lot directly or indirectly." 12 C.F.R. § 1010.1(b). From this definition of "sale," we can extrapolate the definition of "sell" as "to enter into any obligation or arrangement for consideration to purchase or lease any lot directly or indirectly." This interpretation of "sell" is consistent with its legal

definition, which is "[t]o transfer (property) by sale." *Black's Law Dictionary* 1482 (10th ed.2014). We conclude that this regulatory definition is a permissible construction of the statutory term "sell," and based on this definition, only developers who directly or indirectly participate in the exchange of consideration for the purchase of a lot must comply with the disclosure provisions of the Land Sales Act.

Buyers disagree. They argue that all developers are, by definition, liable for all § 1703(a) violations. In doing so, Buyers ignore the plain language of § 1703(a) and look instead to the Act's private right of action provision, § 1709. As Buyers explain, § 1709(a) creates a private right of action "against a *developer or agent* if the sale or lease was made in violation of section 1703(a)," whereas § 1709(b) limits the private right of action for violations of

§ 1703(b)-(d) against only "the *seller or lessor.*" 15 U.S.C. § 1709(a), (b) (emphasis added). Buyers argue § 1709 indicates that all developers are liable for § 1703(a) violations, regardless of the developer's involvement in the actual sale, but only those developers who are also sellers or lessors are liable under § 1703(b)-(d). But Buyers fail to note that § 1703(b)-(d) do not apply to developers at all. The "developer" language in § 1703 applies only to subsection (a). A more accurate reading of § 1709(a) explains instead that a private right of action exists against a developer who violates § 1703(a); it does not provide for a private right of action against *any* developer, irrespective of whether the developer was involved in the § 1703(a) violation.[6]

■■■ Our reading of § 1703(a) is not only truer to its plain language than Buy-

---

**6.** Buyers also rely on a variety of district court cases to argue that RP is liable, simply because it meets the definition of developer. But these cases either deal with liability under the Land Sales Act's antifraud provision, § 1703(a)(2), or address whether a party qualifies as a developer, without reaching the ultimate issue of liability. *See Oginsky v. Paragon Props. of Costa Rica LLC,* 784 F.Supp.2d 1353, 1366–67 (S.D.Fla.2011) (concluding that even if defendants were developers, plaintiffs failed to plead their fraud claim with specificity and failed to allege that a statement of record had not been filed as required to state a claim under § 1703(a)(1)(A)); *Aaron v. Trump Org., Inc.,* No. 8:09–cv–2493–T–23AEP, 2011 WL 2784151, at *4 (M.D.Fla. July 15, 2011) (concluding in a case alleging violation of the antifraud provision that defendant qualified as a developer or agent because it "indirectly advertised for sale or personally participated in the sale of the units"); *Nahigian v. Juno Loudoun, LLC,* 684 F.Supp.2d 731, 746–47 (E.D.Va.2010) (concluding that plaintiff alleged sufficient facts to survive summary judgment on whether defendant Ritz–Carlton Hotel Company was a developer, but not reaching the issue whether Ritz–Carlton was liable for any alleged Land Sales Act violations); *Plant v. Merrifield Town Ctr. Ltd.*

*P'ship,* 711 F.Supp.2d 576, 598–99 (E.D.Va. 2010) (concluding that the factual allegations in the complaint were sufficient to create a plausible inference that defendant was a developer or agent); *Merritt v. Lyons Heritage Pasco, LLC,* No. 8:09–CV–1201–T–27TGW, 2010 WL 3666763, at *3 (M.D.Fla. Sept. 15, 2010) (concluding that plaintiffs had alleged sufficient facts in the complaint showing defendants advertised lots for sale and were therefore developers, potentially liable under the Land Sales Act's antifraud provision).

Buyers' reliance on the Fourth Circuit's per curiam decision in *Olsen v. Lake Country, Inc.,* 955 F.2d 203 (4th Cir.1991), is similarly misplaced. The central question in *Olsen* was the converse of the central question in this case. In *Olsen,* there was no dispute that defendant had sold the lots at issue, *Id.* at 204; the issue was whether a seller who is not the original developer can still qualify as a developer under the Act. *Id.* at 205–06. Although *Olsen* provides useful guidance in understanding the reach of the term developer to secondary sellers, it leaves unanswered the primary question in this case, which is whether a party that is undisputedly a developer is the *type of developer* that can be held liable for the *type of violations* that occurred under § 1703(a).

ers', it also makes sense from an equitable perspective. Only the seller has ultimate control over whether a purchaser receives a property report or whether a statement of record is in effect at the time of the real estate transaction. Indeed, at the time of the transaction, a nonseller-developer may not even be aware that the purchaser and seller are entering into an agreement. And because a nonseller-developer is not party to the agreement, it has no authority to insist that the requisite disclosures are made before the transaction is complete. Therefore, Congress's imposition of liability for the failure to file a statement of record or to deliver a property report only on a developer who is also a seller targets the party with the ability to comply with these provisions of the Land Sales Act.

Contrary to the dissent's position,[7] we also view this reading as consistent with the Act's remedial purpose of preventing fraud because, under our reading, the antifraud provision of the Land Sales Act, § 1703(a)(2), is not similarly limited. Indeed, had Buyers brought a claim under

the Act's antifraud provision, they may have had a viable claim against RP, regardless of whether RP was involved in the sale of the lots at issue. But Buyers did not bring a fraud claim under § 1703(a)(2) or otherwise. Instead, Buyers stipulated to the dismissal of their state fraud claims, and they never asserted a claim under the Land Sales Act's antifraud provision.

Although the dissent acknowledges there is no fraud claim before us, its opinion assumes RP participated in some underlying fraudulent conduct, which "lured" Buyers into entering the Contracts. In an effort to portray these transactions as tainted, the dissent asserts the condominium units "were much smaller than promised, lacked many of the promised amenities, and otherwise were not as represented."[8] But the district court never made such findings, nor did the parties include such information in their stipulated facts or in their arguments on appeal. Although Buyers alleged in their complaint that the con-

---

**7.** The dissent contends that our interpretation is "both technical and restrictive in a manner that voids the very purpose of the Land Sales Act" and ignores this court's precedent in *McCown v. Heidler*, which instructs us to interpret the Act to further its antifraud purpose. 527 F.2d 204, 207 (10th Cir.1975), *implied abrogation on other grounds recognized by Anixter v. Home–Stake Prod., Co.*, 77 F.3d 1215, 1231 (10th Cir.1996). But unlike *McCown*, the issues in this appeal do not involve the antifraud provisions of the Land Sales Act. *Id.* at 207 (holding directors and officers of the culpable developer and "fraudulent planners and profit makers" liable under the Land Sales Act). And courts interpreting *McCown* have understood it to extend liability only to those who participated in the fraud. *See Parra v. Minto Town Park, LLC*, No. 08–14168–CIV, 2008 WL 4773272, at *2 (S.D.Fla. Oct. 30, 2008) (citing *McCown* for the proposition that, "Even under [the Land Sales Act's definition of developer], Plaintiffs must still sufficiently set forth ... the individ-

ual's personal involvement in the allegations."); *Aboujaoude v. Poinciana Dev. Co. II*, 509 F.Supp.2d 1266, 1276 (S.D.Fla.2007) (citing *McCown* and concluding that plaintiff must "sufficiently set forth both the basis for the fraud and [the corporate officer's] personal involvement"); *United States v. Sebring Homes Corp.*, 879 F.Supp. 894, 898 (N.D.Ind. 1994) (distinguishing *McCown* on the basis that, in *McCown*, "the individuals held liable participated in fraud"). Here, RP was not an officer or director of Trailhead LLC, and Buyers have not alleged fraud.

**8.** The dissent also asserts that because Buyers were not furnished a property report, they were unaware of what amenities they could expect to receive. This ignores the fact that the Contracts themselves contained a "Gondola and Club Amenities" provision, which described the amenities RP would provide as master developer and included estimated deadlines for the completion of these amenities.

dominium units were not built as represented, they made these allegations in support of their breach of contract and state fraud claims, which were dismissed without prejudice. Similarly, Buyers described in their affidavits that when they visited the Trailhead Lodge in 2009, while it was still under construction, they were concerned about the size of the units and that promised amenities would not materialize. But Brent Pearson refuted these allegations in his affidavit, explaining "[t]he athletic club and pool area were both complete by 2009" and "[t]he gondola opened more than two years ahead of schedule, on February 1, 2010." More importantly, the district court never entered factual findings on these allegations because doing so was unnecessary to resolve the Land Sales Act claims before it. Therefore, unlike the dissent, we confine our review to the issues on appeal, which do not include any findings or claims of fraud.[9] *See Harman v. Pollock,* 446 F.3d 1069, 1089 (10th Cir.2006) (explaining that federal appellate courts generally do not consider issues not passed upon below and therefore declining to address an argument that "was not raised before nor ruled upon by the trial court").

The dissent's discussion of the history of the 1979 Amendments to the Land Sales Act, although accurate, likewise misses the mark. As the dissent explains, in 1979 Congress amended the Land Sales Act to address the problems resulting from developers who failed to deliver on promised amenities. *See Bodansky v. Fifth on the Park Condo, LLC,* 635 F.3d 75, 79–81 (2nd

Cir.2011). Pursuant to the 1979 Amendments, it is now unlawful "to represent that roads, sewers, water, gas, or electrical service, or recreational amenities will be provided or completed by the developer without stipulating in the contract of sale or lease that such services or amenities will be provided or completed." 15 U.S.C. § 1703(a)(2)(D).

The dissent asserts that Congress's "purpose in enacting the 1979 Amendments was to provide a remedy for exactly the type of conduct that is before us." But the only conduct before us is the failure to have a statement of record in effect and the failure to deliver a property report at the time Buyers purchased the condominium units in Trailhead Lodge. These claims arise solely under subsections § 1703(a)(1)(A)-(B), which were substantively unaltered by the 1979 Amendments. *Compare* 15 U.S.C. § 1703(a)(1) (1976), *with id.* § 1703(a)(1)(A)-(B) (1982). Had Buyers asserted a Land Sales Act claim based on the alleged failure to provide promised amenities, both our analysis and the entities' liability would be dictated by the antifraud provisions of the Act and the factual record developed in the trial court on those issues. Because Buyers have asserted only claims for nondisclosure, our review is cabined accordingly.

■ To summarize, we conclude that RP's status as a developer is not enough by itself to make RP liable for the failure to file a statement of record or to deliver a property report when Buyers entered the Contracts with Trailhead LLC. The Land Sales Act's definition of developer contem-

---

**9.** Were we not constrained by the district court's findings of fact, we might reach different conclusions than the dissent concerning the accuracy of the Buyers' allegations. *See* Appellee Supp.App. Vol. I at 48 (RP's answer denying Buyers' allegations that the constructed units were not as represented); Ap-

pellee Br. at 3 & n. 3 (alleging Buyers' decision to rescind the Contracts had nothing to do with the quality of the units or provision of amenities, but instead was a result of the dramatic decrease in property values caused by the 2008–09 collapse of the housing market).

plates three categories of developers: those who directly or indirectly sell lots, those who directly or indirectly offer to sell lots, and those who directly or indirectly advertise for the sale of lots. *Id.* § 1701(5) (2012). The plain language of the disclosure provisions explains that it is unlawful "to sell" lots without providing a property report or having in effect a statement of record. Accordingly, only those entities that fit within the first category of developers—that is, those who directly or indirectly sold the lots at issue—will be liable for violations of the disclosure provisions.

Thus, RP is liable only if it directly or indirectly sold Buyers the Trailhead Lodge condominium units. Because RP did not participate in the exchange of consideration for the purchase of the units, it does not meet the definition of a direct seller. We therefore turn to the question whether RP is liable as an indirect seller of the Trailhead Lodge condominium units.

### B. Indirect Seller Liability

Buyers contend RP meets the definition of an indirect seller. Specifically, they argue the district court erred in defining an indirect seller as one who exercises "a significant level of control over the sale of the lots at issue" and in concluding that RP did not qualify as an indirect seller under this definition. Instead, Buyers insist the proper definition of indirect seller is one who "participates in the sales efforts," and that RP's early efforts to advertise and market the Wildhorse Meadows development as a whole and Trailhead Lodge specifically demonstrate it qualifies as an indirect seller of the Trailhead Lodge condominium units.

**1. An Indirect Seller Is One Who Is Involved in the Selling Efforts.**

Few courts have addressed the indirect seller component of the Land Sales Act's definition of developer. The Third Circuit was the first and, until the present case, the only federal circuit to have analyzed the indirect seller language. *See Bartholomew v. Northampton Nat'l Bank of Easton, Pa.*, 584 F.2d 1288 (3rd Cir.1978). The plaintiffs in *Bartholomew* were purchasers of unimproved lots in a recreational development. *Id.* at 1290. Plaintiffs purchased the lots through installment purchase contracts, and the developer, Castle Kress, assigned the contracts to one of three banks under prearranged financing agreements. *Id.* at 1291. The development eventually failed, and plaintiffs brought suit against the three banks and an individual, Mr. Brock, who owned Castle Kress's limited partner entity, alleging they were indirect sellers, liable for violations of the Land Sales Act. *Id.* at 1291–92. The district court entered summary judgment in favor of the defendants after concluding they were not "developers or agents" under the Land Sales Act because they did not sell the lots. *Id.* at 1292. Plaintiffs appealed, claiming the banks and Mr. Brock were "planners, participants, and profit-makers" who fall within the definition of "indirect sellers" under the Act. *Id.* at 1293.

The Third Circuit affirmed. It concluded the Land Sales Act's indirect seller reference "can only be constituted as encompassing those who conduct their selling efforts through means other than direct, face-to-face contact with buyers, as, for example, through agents." *Id.* It further explained, "There is no indication in the language of the statute or in the legislative history of the Act that an indirect seller is other than one who is involved in some manner in the selling efforts related to a land development project." *Id.* Because neither the banks nor Mr. Brock were involved in the selling efforts, the Third

Circuit held they did not qualify as indirect sellers and therefore could not be liable for the § 1703 violations. *Id.*

A handful of district courts have also analyzed the Land Sales Act's indirect seller language, and all have relied on the *Bartholomew* definition. For example, in *Hammar v. Cost Control Marketing & Sales Management of Virginia, Inc.,* the court concluded there were issues of material fact in dispute that precluded summary judgment on the issue of whether a parent company was a liable developer under the Land Sales Act. 757 F.Supp. 698, 703–05 (W.D.Va.1990). The district court had "no doubt" the subsidiary, CCM–VA, fit the definition of a developer because it directly sold the lots at issue to the plaintiffs. *Id.* at 703. The court also considered whether the parent company, CCM, qualified as an indirect seller and thus a liable developer. *Id.* at 704–05. Adopting the *Bartholomew* test, the court reasoned CCM would qualify as a developer if there was "some indication CCM was involved in the selling effort." *Id.* at 705.

In determining whether CCM had been involved in the selling effort, the court found relevant the fact that CCM–VA and CCM had "identical ownership, boards of directors, and management" and that the president of CCM "directed that CCM–VA be formed for the purpose of purchasing lots within the ... subdivision and marketing and selling them to the general public." *Id.* at 704. The court also found probative two documents written on CCM stationery, which discussed appointment of sales executives and outlined sales procedures. *Id.* at 705. It concluded there was a "substantial fact conflict with plaintiff's factual evidence that CCM was involved in the selling activities of CCM–VA," but further stated "the present evidence indicates that CCM is an indirect seller." *Id.* Accordingly, the court in *Hammar* denied CCM's

motion for summary judgment. *Id.; see also Barker v. Hostetter,* No. 13–5081, 2014 WL 1464319, at *9 (E.D.Pa. Apr. 15, 2014) (concluding defendants were indirect sellers because they were "the Declarants in the Public Offering Statement ... and where, as Declarants, [defendants] made an offer to sell lots to prospective purchasers"); *Hester v. Hidden Valley Lakes, Inc.,* 495 F.Supp. 48, 54 (N.D.Miss.1980) (adopting the *Bartholomew* test and ruling that the president and secretary of a developer corporation were indirect sellers because they had signed the relevant property reports and statements of record and had "sufficient control over the salesmen and sales policy of the corporation to be considered indirect sellers").

■ We agree with the Third Circuit that an indirect seller is one who is involved in the selling efforts "through means other than direct, face-to-face contact with buyers." *See .Bartholomew,* 584 F.2d at 1292. Individuals or entities that sell lots through an agent are the clearest example of indirect sellers, but parent companies like the one in *Hammar* that have considerable control over the selling efforts of a subsidiary may also qualify as indirect sellers. Likewise, under the proper set of facts, individual officers, directors, or shareholders of the selling entity could qualify as indirect sellers. *See generally F.D.I.C. v. Oldenburg,* 34 F.3d 1529, 1555 (10th Cir.1994) (explaining the conditions necessary to pierce the corporate veil to reach individual officers, directors, or shareholders). Significantly, the common thread running through each of these categories of indirect sellers is substantial involvement in the selling efforts with respect to the individual lots.

## 2. RP Is Not an Indirect Seller.

■ Although this definition of indirect seller differs somewhat from that adopted

by the district court, we agree with the district court that RP is not an indirect seller because it was not involved in the efforts to sell the Trailhead Lodge condominium units. Buyers claim the following evidence demonstrates RP's role as an indirect seller: (1) RP's involvement in the advertising and marketing of Trailhead Lodge, (2) RP's alleged involvement in S & P Properties' sales training seminars, (3) RP and Trailhead LLC's overlapping ownership and Messrs. Hill and Pearson's involvement in both entities, and (4) the fact that RP still owned the Trailhead parcel at the time Buyers entered the Contracts with Trailhead LLC. We address each of these arguments in turn.

### a. *RP's advertising activities*

First, Buyers argue RP qualifies as an indirect seller because, by advertising Trailhead Lodge through promotional materials that marketed Wildhorse Meadows as a whole and Trailhead Lodge specifically, RP was involved in the selling efforts. But in so arguing, Buyers conflate two terms—"to sell" and "to advertise"—that the Land Sales Act explicitly distinguishes. As previously explained, the Act's definition of developer differentiates between those who qualify as developers because they directly or indirectly sell lots and those who are developers because they directly or indirectly advertise for the sale of lots. 15 U.S.C. § 1701(5). And the Land Sales Act imposes different obli-

gations and liabilities on developers who sell than on those who simply advertise. Specifically, liability for the failure to file a statement of record or to deliver a property report is limited to the (direct or indirect) seller of the lots, while liability for inconsistent advertising falls on both sellers and advertisers. *Compare id.* § 1703(a)(1)(A)-(C) (making it unlawful "to sell" any lots without having in effect a statement of record, without providing a property report, or by providing a statement of record or property report that contains material misstatements or omissions), *with id.* § 1703(a)(1)(D) (making it unlawful "to display or deliver" to prospective purchasers inaccurate or inconsistent advertising and promotional material). Furthermore, the regulations promulgated under the Act define "sale" as the transaction where consideration is exchanged to purchase a lot. *See* 12 C.F.R. § 1010.1(b). Accordingly, we do not read the *Bartholomew* court's use of the phrase "involved in some manner in the selling efforts" to include involvement solely in advertising efforts. To do so would be inconsistent with the plain language of the Land Sales Act, which distinguishes between these two activities. As a result, RP's advertising efforts are not determinative of whether it is an indirect seller.[10]

### b. *Sales trainings*

Second, Buyers claim RP was an indirect seller because it led sales training

---

**10.** Like Buyers, the dissent relies in large part on actions RP took before Trailhead LLC was formed in arguing RP qualifies as an indirect seller. As master developer of the Wildhorse Meadows subdivision, RP certainly played a prominent role in the initial planning, permitting, and marketing of Wildhorse Meadows generally and Trailhead Lodge specifically. But as the district court found, once Trailhead LLC was formed, it took over all advertising efforts, and RP assigned all rights to the Trailhead Lodge Project Agreement to Trailhead LLC. We cannot conclude the district court's

finding was clearly erroneous. *Aetna Cas. & Sur. Co. v. Hunt,* 486 F.2d 81, 84 (10th Cir. 1973) (explaining that even when the district court's factual findings are based on documentary evidence instead of live witness testimony, "we are loath to overturn the findings of a trial court unless they are clearly erroneous"). Accepting this finding, the assignment made Trailhead LLC solely responsible for the development of the Trailhead parcel and, more importantly, the sale of Trailhead Lodge units.

seminars instructing S & P Properties on its strategy for selling the various lots in Wildhorse Meadows, including Trailhead Lodge. While this fact might weigh in favor of concluding that RP is an indirect seller, the portion of the record Buyers rely on does not support this allegation. Instead, the record reflects that "S & P held a training session for the S & P staff." The March 6, 2007, Trailhead Lodge Marketing & Sales Strategy created by S & P Properties (and paid for by Trailhead LLC) further supports that S & P, not RP, was responsible for implementing the Trailhead Lodge sales efforts. Buyers fail to direct us to any portion of the record indicating RP led any sales training, and the stipulated facts adopted by the district court do not include such a finding.

### c. *Trailhead LLC and RP's business relationship*

Likewise, nothing about Trailhead LLC and RP's business relationship demonstrates that RP was significantly involved in Trailhead LLC's selling efforts or that Trailhead LLC was acting as an agent for RP. At the relevant time, neither company held any interest in the other, and each company had separate owners. The following diagram illustrates the ownership structure of RP, Trailhead LLC, and management company Resort Ventures at the time of the relevant transactions:

Additionally, Mr. Pearson owned 29% of Howl of the North, LLC. As this diagram indicates, the three entities had some overlapping ownership (specifically, Whitney Ward and David Hill, and to a lesser extent Brent Pearson). But Messrs. Ward, Hill, and Pearson held only minority interests in Trailhead LLC (5.5%, 4.4%, and 1.1%, respectively), and the three held only an indirect interest in RP, as partial owners of RP's minority owner, RVW/WHM, which controlled only 10% of RP. Thus, at the time of the relevant transactions, the 90% owner of RP—Rockpoint [11]—had no ownership interest in Trailhead LLC, and the 90% owners of Trailhead LLC—Messrs. Posen and Whitley—had no ownership interest in RP. Although Messrs. Ward, Hill, and Pearson had minority interests in both entities, they were primarily involved as owners and officers of the management company, Resort Ventures.

---

**11.** Rockpoint is a fund with offices in California, Texas, and Massachusetts that shares no common members, officers, principals, or partners with RP's other owner, RVW/WHM.

The business structure of the relevant entities thus demonstrates that none of the entities were in a parent-subsidiary relationship and that neither RP nor Trailhead LLC acted as a mere tool of the other. Although the dissent frequently refers to Trailhead LLC as a shell company, the district court made no such finding. Instead, the district court found that neither entity controlled the other. This ruling constitutes a finding of fact, subject to a clearly erroneous standard of review. *See Milgo Elec. Corp. v. United Bus. Commc'ns, Inc.*, 623 F.2d 645, 659 (10th Cir.1980) (explaining that a district court's alter ego determination is a factual finding, which "is presumptively correct and must be left undisturbed on appeal unless it is clearly erroneous"); *Nat'l Bond Fin. Co. v. Gen. Motors Corp.*, 341 F.2d 1022, 1023 (8th Cir.1965) ("The question of whether a corporation is an instrumentality ... of another corporation presents primarily an issue of fact to determine upon the basis of the facts of each individual case. The clearly-erroneous rule set forth in Fed. R.Civ.P. 52(a) applies."); 1 *Fletcher Cyc. Corp.* § 41.10 (same). Tellingly, Buyers have not challenged the district court's finding that RP did not control Trailhead LLC. But even had they done so, we are unpersuaded that this finding was "wholly without factual support in the record," nor are we "definitively and firmly convinced that a mistake has been made," as required to reverse a factual finding under the clearly erroneous standard. *Ute*

*Mountain Ute Tribe v. Rodriguez*, 660 F.3d 1177, 1185 (10th Cir.2011).

Nevertheless, the dissent asserts that none of the Buyers, including one who was also an employee of S & P Properties, knew that RP and Trailhead LLC were separate entities.[12] But this misperception does not overcome the reality that the two entities were distinct. Unlike the entities in the *Hammar* case, which had the same directors and officers and were in a parent-subsidiary relationship under which the parent exercised considerable control over the subsidiary's selling activities, RP and Trailhead LLC were separate business entities operating under different ownership. Based on the stipulated facts and the exhibits submitted by the parties, the district court concluded, "the evidence in the record does not support the conclusion that RP had a significant level of control over the sale of Trailhead Lodge condominiums." We cannot conclude this finding is clearly erroneous.

The dissent also relies on the fact that nearly a year and a half after Buyers entered the Contracts with Trailhead LLC, Messrs. Ward, Posen, Hill, and Pearson, along with WMGP, LLC, formed Wildhorse Meadows Land Co., LP, which then purchased Rockpoint's interest in RP. Although well after Buyers purchased their units in Trailhead Lodge, RP's structure changed,[13] at the time Buyers entered the Contracts with Trailhead LLC, RP was neither directly nor indirectly involved

---

**12.** The dissent cites to the affidavit of Devon C. Dalzell. But the portion of Ms. Dalzell's affidavit to which the dissent cites states only that none of the client representatives—namely Brent Pearson, David Hill, and Mariana Ishida—"ever discussed Trailhead Lodge as being separate from the rest of the Wildhorse Meadows development." Although this indicates Trailhead Lodge was part of the Wildhorse Meadows subdivision and the developers of each parcel had engaged S & P

Properties' services, it says nothing of the distinction between Trailhead LLC and RP for purposes of contracting with Buyers for the purchase of condominiums in the Trailhead Lodge.

**13.** Even after this transaction, RP and Trailhead LLC maintained distinct ownership because Wallace Whitley, a 44.5% owner of Trailhead LLC, remained uninvolved in RP.

in the sale of the Trailhead Lodge units to Buyers. Not surprisingly, Buyers did not rely on this post-transaction acquisition in the district court or on appeal, and we likewise do not see its relevance to the issues before us. Instead, we agree with the district court that the business structure of RP and Trailhead LLC at the time of the relevant transactions does not indicate that RP was an indirect seller.

d. *The transfer of the Trailhead parcel to Trailhead LLC after the date of the Contracts*

Buyers' fourth contention is that RP was an indirect seller because Trailhead LLC did not acquire the Trailhead parcel from RP until two days after Buyers purchased the Trailhead Lodge condominium units from Trailhead LLC. Buyers insist that because RP owned the Trailhead parcel at the time they agreed to purchase Trailhead Lodge units, RP was an indirect seller of the units. But Buyers did not purchase ownership in the Trailhead parcel from Trailhead LLC; they purchased condominium units in the yet-to-be-built Trailhead Lodge. At the time Buyers entered the Contracts for the purchase of units in the promised Trailhead Lodge, the Trailhead parcel remained undeveloped. And the Trailhead Lodge Project Agreement had been assigned to Trailhead LLC, effective April 15, 2007, thereby giving Trailhead LLC all rights to the development of Trailhead Lodge.

 Moreover, the condominium sales were based on Trailhead LLC's imminent purchase of the parcel. There is nothing nefarious or unusual about the presale of units in a planned development, which is often a precondition of the funding necessary to purchase the subject real property. Indeed, Colorado law has long held that a vendor may validly sell land it does not yet own. *Kunzmann v. Petteys*, 74 Colo. 342, 221 P. 888, 890 (1923) ("Public policy does not prevent one from making a valid agreement to sell or dispose of property which he does not own at the time."). Therefore, the fact that the units in a yet-to-be-built condominium project were to be built on a yet-to-be-acquired parcel of land does not negate the fact that RP was not a party to the Contracts with the Buyers for the purchase of those units. Nor does it show that RP was involved in Trailhead LLC's efforts to sell the Trailhead Lodge condominiums.

We agree with the district court that RP is not an indirect seller. RP's advertising activities show only that it was involved in efforts to market the Wildhorse Meadows subdivision, including the Trailhead Lodge. The Land Sales Act explicitly distinguishes between seller-developers and advertising-developers for purposes of liability. And neither the business relationship between RP and Trailhead LLC at the time of the sale nor the fact RP still owned the Trailhead parcel when Buyers purchased the condominium units to be built by Trailhead LLC demonstrates RP was an indirect seller. Because RP was neither a direct nor indirect seller of the lots at issue, RP is not liable for Trailhead LLC's failure to have a statement of record in effect or its failure to provide Buyers with a property report at the time Trailhead LLC entered the Contracts with Buyers.

## IV. CONCLUSION

For these reasons, we **AFFIRM** the district court's ruling in favor of RP under the disclosure provisions of the Land Sales Act, 15 U.S.C. § 1703(a)(1)(A)-(B).

LUCERO, Circuit Judge, dissenting.

Congress enacted the Interstate Land Sales Full Disclosure Act ("Land Sales Act") to "prevent false and deceptive practices in the sale of unimproved tracts of

land by requiring developers to disclose [certain] information [to] potential buyers." *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla.,* 426 U.S. 776, 778, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976). The plaintiffs before us, buyers of real estate in Routt County, Colorado, are precisely the type of buyers Congress sought to protect. They were lured into making large earnest money payments by the prospect of owning luxury condominium units in an upscale ski town, only to discover—years later—that their condominium units were much smaller than promised, lacked many of the promised amenities, and otherwise were not as represented. Because the developer failed to make statutorily required disclosures, the buyers had no way of knowing that the promised amenities would not materialize, and that the size of the condominium units would be noncompliant.

No one disputes that this failure to disclose violated the Land Sales Act. The issue before us is whether plaintiffs can recover for that violation from the master developer, RP Steamboat Springs, LLC ("RP"), given that RP used a warren of corporations to ultimately deliver contracts to plaintiffs from Trailhead Lodge at Wildhorse Meadows, LLC ("Trailhead LLC"), a now-insolvent shell company. The majority declines to allow recovery against RP. I respectfully disagree. RP was clearly liable as an indirect seller because it was involved in the selling efforts. To conclude the opposite is to defy the purpose of Congress in enacting the statute.

## I

I agree with and concur in much of the thorough description of caselaw from other jurisdictions defining an "indirect seller" under the Land Sales Act that the majority provides. (Majority Op. 1213-15.) As the Third Circuit held in *Bartholomew v.*

*Northampton National Bank of Easton, Pennsylvania,* 584 F.2d 1288 (3d Cir.1978), and as district courts nationwide have subsequently recognized, an indirect seller is one who "is involved in some manner in the selling efforts related to a land development project." *Id.* at 1293. I disagree with the conclusion of the majority about how that capacious definition applies to the case at bar.

The majority asserts that the words "to sell" in 15 U.S.C. § 1703(a)(1)(A) & (B) preclude advertisers who do not sign a sales contract from being liable as indirect sellers. (Majority Op. 1215.) But the fact that the definition of a "developer" in § 1701(5) includes "any person who, directly or indirectly, sells" a lot compels the conclusion that liability under § 1703(a)(1)(A) & (B) attaches to parties beyond those who sign a sales contract. The very existence of an "indirect seller" category means that Congress envisioned a wider range of culpable parties, and also that the term "to sell" encompasses activities beyond the mere signing of a sales contract. This is confirmed by the Consumer Financial Protection Bureau regulations defining "sale" to include "any ... arrangement for consideration to purchase or lease a lot directly or indirectly." 12 C.F.R. § 1010.1(b). The agency would not identify direct and indirect sellers as distinct categories if "indirect sellers" were to be defined identically to "direct sellers," as parties who actually sign a sales contract. *See Fuller v. Norton,* 86 F.3d 1016, 1024 (10th Cir.1996) ("We avoid interpreting statutes in a manner that makes any part superfluous.").

## II

When the language of a statute is ambiguous, "a court may seek guidance from Congress's intent, a task aided by reviewing the legislative history. A court can

also resolve ambiguities by looking at the purpose behind the statute." *United States v. Quarrell,* 310 F.3d 664, 669 (10th Cir.2002) (quotations and citations omitted).[1]

An expansive interpretation of the term "indirect seller" is in accord with the purpose of the Act, as shown by its legislative history. Our sibling circuits have repeatedly recognized the purpose of the Act to be the prevention of deceptive real estate sales practices by requiring developers to disclose specified information to buyers. *See Berlin v. Renaissance Rental Partners, LLC,* 723 F.3d 119, 121, 127 (2d Cir.2013) (citing *Bacolitsas v. 86th & 3rd Owner, LLC,* 702 F.3d 673, 676 (2d Cir. 2012)); *Nickell v. Beau View of Biloxi, L.L.C.,* 636 F.3d 752, 754 (5th Cir.2011) (citing *Law v. Royal Palm Beach Colony, Inc.,* 578 F.2d 98, 99 (5th Cir.1978)); *Long v. Merrifield Town Ctr. Ltd. P'ship,* 611 F.3d 240, 244–45 (4th Cir.2010); *Markowitz v. Ne. Land Co.,* 906 F.2d 100, 103 (3d Cir.1990) (citing *Cost Control Mktg. & Mgmt., Inc. v. Pierce,* 848 F.2d 47, 48 (3d Cir.1988) (per curiam)); *Winter v. Hollingsworth Props., Inc.,* 777 F.2d 1444, 1446–47 (11th Cir.1985). Recently, the Second Circuit comprehensively explained the history of the Land Sales Act and the specific history of concerns that led to its enactment. *See Bodansky v. Fifth on the Park Condo, LLC,* 635 F.3d 75, 79–81 (2d Cir.2011). Until the late 1960s, federal law did not restrict fraudulent interstate land sales. *Id.* at 80. It comes as no surprise that in an unregulated sales scheme, unsuspecting victims were often sold uninhabitable land. *Id.* To prevent such schemes, Congress passed the Land Sales Act in 1968, which required developers to make full disclosures to buyers and expanded the remedies available to injured buyers. *Id.*

In 1979, Congress amended the Act because "problems continue[d] as a result of the failure of developers to complete promised amenities[.]" *Id.* at 80–81 (quoting H.R.Rep. No. 96–154, at 30 (1979), *reprinted in* 1979 U.S.C.C.A.N. 2317, 2346). This circuit recognizes the Congressional commitment to protect buyers who do not receive promised amenities. In *Solomon v. Pendaries Properties, Inc.,* 623 F.2d 602 (10th Cir.1980), we explained that "[r]ecognizing the problem created when developers become bankrupt before completing promised amenities, Congress amended section 1703 in 1979 to provide a contractual basis for relief when roads, utilities, and recreational amenities are not in fact completed by developers." *Id.* at 604–05.[2]

---

1. The majority implies that our recent decision in *Donner v. Nicklaus,* 778 F.3d 857 (10th Cir.2015), indicates that a regulatory definition must guide our interpretation when a statutory term in the Land Sales Act is ambiguous. (*See* Majority Op. 1209-10, 1215). But in *Donner,* the plaintiffs conceded that a statutory term was ambiguous, and argued that a regulatory definition supported their position. *See Donner,* 778 F.3d at 864–67. The *Donner* court was thus tasked with interpreting a regulation. By contrast, in the case at bar, neither party conceded that the statute was ambiguous, nor did either discuss the regulatory definition of "sale." We are therefore tasked with interpreting a statute, not with ascertaining the meaning of a regulation. In doing so, although we must give appropriate deference to any regulations, we must first "determine whether Congress had an intent on the question at issue by employing traditional tools of statutory construction, including examination of the statute's text, structure, purpose, history, and relationship to other statutes." *Hackwell v. United States,* 491 F.3d 1229, 1233 (10th Cir.2007) (citations and quotations omitted). Thus, even though the agency has issued a regulation defining a potentially ambiguous statutory term, the purpose of the Land Sales Act remains highly relevant to our inquiry.

2. The majority argues that because only § 1703(a)(1)(A) & (B) are at issue in this appeal, and neither subsection was significantly altered by the 1979 Amendments, those

*Solomon* quoted a section of the 1979 legislative history, which explained that the amendments:

> would also require that whenever a developer represents orally or in writing that ... recreational amenities will be provided or completed by the developer, the contract of sale or lease must stipulate that such ... amenities will be provided or completed. This provision was intended to assure that when developers or their sales agents make seductive promises through oral or written representations or advertisements to induce individuals to buy land, the individuals have a contractual basis for assuring the ... amenities are completed within a reasonable time. It provides a statutory basis for suit if the contract fails to reflect the representations that were made.

*Id.* at 605 (quoting H.R.Rep. No. 96–154, at 36 (1979), *reprinted in* 1979 U.S.C.C.A.N. 2317, 2351–52).

*Solomon* was not the first Tenth Circuit case to recognize the Congressional goal of protecting buyers. In *McCown v. Heidler*, 527 F.2d 204 (10th Cir.1975), *implied abrogation on other grounds recognized by Anixter v. Home–Stake Prod. Co.*, 77 F.3d 1215, 1231 (10th Cir.1996), we addressed the liability of officers, directors, and planners of a bankrupt and insolvent company that sold lots in a golf course community. *Id.* at 206. We reasoned as follows:

> The "developer" of a land sale plan is usually a corporate entity which, in a fraudulent scheme as here alleged, ends up defunct and offers no reserve for recovery to those persons defrauded; so, too, the end selling agent, when the development collapses financially, is often long gone or cannot respond pecuniarily.... The basic protection of the Act, to be meaningful, must be leveled against the fraudulent planners and profit makers for otherwise the Act would be pragmatically barren. No legislative enactment should be rendered ineffective to attain its purpose if such a construction can be avoided.

*Id.* at 207 (citations omitted). Accordingly, we concluded that we must construe the statute "flexibly" rather than "technically and restrictively," and held the individual defendants liable. *Id.* I respectfully disagree with the majority opinion because the interpretation it argues for is both technical and restrictive in a manner that voids the very purpose of the Land Sales Act and ignores our precedent in *McCown*.[3]

Amendments are irrelevant. (Majority Op. 1212.) But this narrowing of the issues before us ignores how crucial disclosure statements are to the statutory scheme as a whole. *See Winter,* 777 F.2d at 1447 ("ILSFDA is an antifraud statute utilizing disclosure as its primary tool...."). In the 1979 Amendments, Congress applauded the successes of the existing disclosure requirements: "In many respects the registration and disclosure procedures required by the Act ... have succeeded in changing industry practices." H.R.Rep. No. 96–154, at 30 (1979), *reprinted in* 1979 U.S.C.C.A.N. 2317, 2346. But it sought to strengthen them by providing a specific basis for relief when disclosed amenities did not materialize. Congress saw the disclosure requirements as a prerequisite to relief when a developer failed to deliver on promised amenities.

**3.** The majority implies that *McCown* is inapplicable to the case at bar because it involved "the antifraud provisions of the Land Sales Act." (Majority Op. 1210–11 n. 7.) But the issue in *McCown* was how "developer" should be defined. Our holding in the case did not interpret any "antifraud" subsection of the statute. *See* 527 F.2d at 206–07. More importantly, *McCown* interpreted the purpose of Congress in enacting the "Act," not in enacting any specific subsection. *See id.* at 207. To restrict the holding of *McCown* to a single subsection of the Act is exactly the sort of "technical and restrictive" interpretation *McCown* forbids. *See id.* Subsequent district

Congress could hardly have been clearer: Its purpose in enacting the 1979 Amendments was to provide a remedy for exactly the type of conduct that is before us. These plaintiffs were promised luxurious condominium units with a number of choice amenities, most notably ski-in, ski-out gondola access.[4] Plaintiffs agreed to pay a purchase price that exceeded the average value per square foot in the area. Plaintiffs signed contracts that severely limited their own remedies, and allowed Trailhead LLC significant discretion to rescind the contract, or to deviate from its terms specifying which amenities would be provided. As the district court concluded, it is only because of the unfavorable nature of these contracts that the Land Sales Act applies in this case at all. Two years after they signed the contracts, plaintiffs discovered the "where's-the-gondola" problem.

Promised amenities were not there. The units were much smaller than had been described in the contract. Trailhead LLC apparently was in a precarious financial situation. Because the contracts allowed Trailhead LLC to deviate from the terms specifying which amenities would be provided, and because plaintiffs had never been given property reports detailing the amenities they could expect to receive, the only choice they had was to exercise their rights under the Act to rescind their contracts. Although Trailhead LLC violated the Land Sales Act, plaintiffs are unable to recover so much as their earnest money from that company. It is insolvent.

Our precedent recognizes that allowing sellers like RP to evade liability through complex corporate structures defeats the purpose of the Land Sales Act.[5] As *Solo-*

court cases from outside our circuit do not change the clear interpretative guidance *McCown* provides. (*Cf.* Majority Op. 1210–11 n. 7.)

4. The majority claims that we cannot consider this fact, and several other facts in the record, because the district court thought them unnecessary to resolve the legal issue before it. (Majority Op. 1211–12.) But "whether the district court failed to consider or accord proper weight or significance to relevant evidence are questions of law we review de novo." *Flying J Inc. v. Comdata Network, Inc.*, 405 F.3d 821, 829 (10th Cir. 2005). We are not precluded from considering facts in the record merely because the district court failed to appreciate their relevance to the legal issue before it. Moreover, the district court did not limit itself to reviewing the stipulated facts submitted to it by the parties. It "judicially noticed all relevant adjudicative facts in the file and record of th[e] case" and acknowledged that it made some of its factual findings "not based on the parties' stipulated facts," including affidavits submitted by the parties. *Dalzell v. Trailhead Lodge at Wildhorse Meadows, LLC*, No. 09–CV–02614–REB–KLM, 2013 WL 61215, at *1, *3 (D.Colo. Jan. 4, 2013) (unpublished). The majority admonishes the dissent for considering information in the record that the parties

did not include in their stipulated facts or in their arguments on appeal, (Majority Op. 1211), but then proceeds to use such information itself, (*see id.* at 1212 (discussing the affidavit of Brent Pearson)).

And although the majority claims that we should ignore facts plaintiffs submitted to support their state-law fraud claims, (*id.* at 1206 n. 4, 1211–12), it is not our role to guess *why* a fact is in the record. In appeals from bench trials, we review the "entire record." *Bishop v. Equinox Intern. Corp.*, 154 F.3d 1220, 1221 (10th Cir.1998).

Nor is the majority correct to the extent it suggests that the plaintiffs' voluntary dismissal of their state-law fraud claims prevents the anti-fraud purpose of the Act from being properly before us. (*See* Majority Op. 1212 (citing *Harman v. Pollock*, 446 F.3d 1069, 1089 (10th Cir.2006)).) In their opening brief, the plaintiffs clearly argue that "ILSA is to be interpreted broadly in favor of consumers to effectuate the statute's remedial purposes, including the punishment of fraud[.]"

5. Analogously, in *Olsen v. Lake Country, Inc.*, 955 F.2d 203 (4th Cir.1991), the court read the Land Sales Act "broadly to effectuate" the goal of "prohibit[ing] fraud and ... protect[ing] purchasers of land which is part of a common promotional scheme." *Id.* at 205.

*mon* and *McCown* demonstrate, we have construed the Act to find parties liable despite these entangled organizational structures that might otherwise shield the profit makers from liability. We should follow our circuit precedent and construe the Land Sales Act to effectuate its purpose. We should not allow RP to avoid liability by hiding behind Trailhead LLC, a judgment-proof shell company.

### III

After describing the extensive involvement of RP in selling Trailhead Lodge condominium units to the plaintiffs, the majority inexplicably concludes that each form of such entanglement does not make RP "involved in some manner in the selling efforts." (Majority Op. 1215–18.) My vision occludes in trying to see and understand the proposition that RP was not "involved in some manner" in selling Trailhead Lodge. RP exclusively controlled all advertising and marketing of Trailhead Lodge for several months before Trailhead LLC even existed, had ownership and management overlapping that of Trailhead LLC, and actually owned the land where the condominiums were to be built at the time the plaintiffs signed their sales contracts.

The majority reasons that under Colorado law, "a vendor may validly sell land it does not yet own." (Majority Op. 1218 (citing *Kunzmann v. Petteys*, 74 Colo. 342, 221 P. 888, 890 (1923).)) But legality of the transfer has never been the issue in this case. It may have been legal for Trailhead LLC to sell planned condominium units on land that belonged to RP. But that is irrelevant to the issue before us: whether RP was "involved in some manner in the selling efforts." Given that RP owned the property when Trailhead LLC advertised and sold the condominium units with RP's consent, it defies reason to suggest that RP was not involved. This fact is punctuated by the record references that prove that two days after the "sale," the property at issue was transferred from RP to Trailhead. That such an occurrence is not "unusual" does not in any way prove that RP was not involved. (*See* Majority Op. 1218.)

It is true that RP and Trailhead LLC were not in a principal-agent or parent-subsidiary relationship. *Cf. Hammar v. Cost Control Mktg. & Sales Mgmt. of Va., Inc.*, 757 F.Supp. 698, 703–05 (W.D.Va. 1990). But the majority itself does not cabin its definition of "indirect seller" to a party that is in "control" of selling efforts by another entity. I agree with the majority and the Third Circuit in *Bartholomew* that indirect sellers are parties who are "involved in some manner in the selling efforts related to a land development project ... through means other than direct, face-to-face contact with buyers." 584 F.2d at 1292. Certainly, a parent-subsidiary relationship can be *sufficient* to make the parent corporation an indirect seller. But I am concerned that the majority overextends *Hammar* into a rule that makes "control" over the party signing a contract *necessary* for a party to be an

---

As the majority points out, the *Olsen* court was attempting to ascertain whether a party qualified as a "developer." (Majority Op. 1210 n. 6.) However, *Olsen* is nevertheless relevant to this case, because it assumes that so long as an entity is a developer, it is liable for failure to file the proper disclosures. It holds that a seller who does not file a property report or provide the necessary disclosure is liable if it is "not merely an incidental player" in the land sales scheme, and is "actively involved in the planning and promotion of the development." *Id.* at 206. The court reasoned that to do otherwise would circumvent the purpose of the Land Sales Act "by permitting developers to simply transfer land to separate entities before being sold to the public." *Id.* at 207.

indirect seller. To the contrary, nothing in *Bartholomew,* the case from which the majority and other courts nationwide derive their definition of "indirect seller," indicates that an indirect seller must exercise "control" over another party. The word "control" is notably absent from the opinion of the Third Circuit.

Yet the majority makes much of the district court finding that RP did not control Trailhead LLC. (Majority Op. 1216–17.) I do not dispute this finding of fact, which I agree we must review for clear error. *Sw. Stainless, LP v. Sappington,* 582 F.3d 1176, 1183 (10th Cir.2009) ("In an appeal from a bench trial, we review the district court's factual findings for clear error and its legal conclusions de novo."). Rather, I dispute the legal conclusion of the district court that "[t]he essential quality of an indirect seller under § 1703(a) is a significant level of control over the sale of the lots at issue." *Dalzell,* 2013 WL 61215, at *12. We review such conclusions of law de novo. *Sw. Stainless,* 582 F.3d at 1183; *see also Hofer v. Unum Life Ins. Co. of Am.,* 441 F.3d 872, 875 (10th Cir. 2006) ("When the district court makes nondiscretionary legal determinations based on stipulated facts, our review is de novo."). The majority itself acknowledges that it does not defer to the legal conclusion of the district court about this issue. *(See* Majority Op. 1214-15.) Instead, it follows the Third Circuit and recognizes that an indirect seller is a party that "is involved in the selling efforts." (Majority Op. 1213-14, 1214 (citing *Bartholomew,* 584 F.2d at 1292–93).)

The district court reached an incorrect conclusion of law when it determined that an "indirect seller" must exercise control. Our deference to its factual findings does not require us to defer to this legal conclusion. Rather, applying the proper legal test to the facts before us, we are tasked with determining whether RP was "involved in some manner in the selling efforts." And for the purpose of that inquiry, the overlapping ownership and management of RP and Trailhead LLC is undeniably relevant. There was a lesser degree of overlapping ownership between the two entities at the time the condominium units were sold. But within a year and a half of the sales at issue in this case, the four parties who held majority ownership of Trailhead LLC—Brent Pearson, David Hill, Whitney Ward, and Daniel Posen—became the sole owners of RP. This change in the ownership of RP is relevant because it occurred within the two-year time period in which the plaintiffs had a right to rescind their contracts under the Land Sales Act. *See* § 1703(c). It does not indicate that RP controlled Trailhead LLC in 2007. It merely highlights that the majority owners of Trailhead LLC, the same individuals who spearheaded the Wildhorse Meadows development from the time RP was created in 2005, became the full owners of RP at a later date. It is additional evidence that RP was "involved in some manner in the selling efforts."

Ultimately, however, the issue of corporate structure is far less relevant to the question of whether RP was "involved in some manner in the selling efforts" than the extensive degree to which it was enmeshed in every stage of planning and marketing Trailhead Lodge. RP was formed by Pearson, Hill, and Ward to develop Wildhorse Meadows in several stages. Trailhead Lodge was one of those stages. Those three individuals, along with Mariana Ishida, guided every stage of the development of Trailhead Lodge. The Lodge received approval for its Final Development Plan from the City of Steamboat Springs based on affordable housing provided by RP through other phases of the Wildhorse Meadows development, and

based on presentations made to the City by the aforementioned individuals. RP was listed in the permitting process as the owner of Trailhead Lodge. Pearson and other staff directed S & P Destination Properties ("S & P") in marketing Trailhead Lodge for at least five months before Trailhead LLC even existed as an entity. Trailhead LLC could neither direct nor finance advertising efforts at a time that Trailhead LLC did not exist. Although the advertising was ostensibly done on behalf of Trailhead LLC after April 2007 (based on the backdated assignment from RP to Trailhead LLC), that assignment did not happen until July 2007, the same month that S & P planned to end its marketing strategy for Trailhead and the same month that plaintiffs signed the sales contracts.[6] Moreover, as shown by Hill executing the assignment on behalf of both RP and Trailhead LLC, there was no meaningful distinction between the operation and management of the two entities.

Trailhead LLC functioned as little more than a shell company for RP. RP conveyed the property at issue to Trailhead LLC two days after the plaintiffs signed their contracts, which was long after the advertising and promotion had begun. The record is mostly silent as to the nature of the transaction. RP argued below that an indemnity agreement between the two entities provides evidence of their separate nature. Yet this agreement only confirms

that one of the few actions of Trailhead LLC as an organization, separate from RP, was to shield RP from liability.

## IV

The majority reasons that its reading of § 1703(a) "makes sense from an equitable perspective." (Majority Op. 1210–11.) I am blind to such equity. If we are to be guided by equitable considerations, the majority should reach the *opposite* conclusion. The majority envisions a situation in which two developers work independently on different subdivisions within a master development. In such a situation, it might be understandable for one developer not to know if the other filed statements of record or included property reports in its sales transactions. *Cf. Nahigian v. Juno–Loudon, LLC,* No. 1:09CV725 JCC, 2010 WL 3418179, at *9 (E.D.Va. Aug. 23, 2010) (unpublished) (refusing to hold liable a non-owner defendant whose only involvement was in the use of its trademark and who was "not aware" of the relevant disclosures), *aff'd sub nom Nahigian v. Juno–Loudoun, LLC,* 677 F.3d 579 (4th Cir.2012). But that hypothetical situation differs starkly from this case. Both RP and Trailhead LLC contracted out all their operations to Resort Ventures West. Both RP and Trailhead LLC carried out all their actions through the same personnel—Pearson, Hill, Ward, and Ishida.[7]

---

6. The majority claims that the district court "found, *once* Trailhead LLC was formed, it took over all advertising efforts, and RP assigned all rights to the Trailhead Lodge Project Agreement to Trailhead LLC." (Majority Op. 1215–16 n. 10 (emphasis added).) Had the district court made such a finding of fact, I agree that we would review it for clear error. But what the district court actually found was that "Via the Assignment, RP assigned to Trailhead LLC all of RP's right, title and interest in the Trailhead Lodge Project Agreement." *Dalzell,* 2013 WL 61215, at *5.

This assignment occurred in July 2007, several months after Trailhead LLC was formed, and RP's extensive marketing prior to that point suffices to make it "involved in some manner in the selling efforts."

7. That the identity of the actual individuals involved is more pertinent than the corporate structure of the entities is confirmed by *McCown's* clear explanation that "[t]he basic protection of the Act, to be meaningful, must be leveled against the fraudulent planners and profit makers for otherwise the Act would be pragmatically barren." 527 F.2d at 207.

Unlike the defendant in *Nahigian*, RP not only owned the land where Trailhead Lodge was to be built, but also was clearly aware of Trailhead LLC's actions, because all of Trailhead LLC's day-to-day operations were carried out by individuals who simultaneously did the same for RP. RP cannot be reasonably described as a "developer[ ] . . . not involved in the ultimate real estate transaction." (Majority Op. 1209.) Rather, RP was intimately involved in and aware of that transaction. No equitable purpose is served by adhering to the fiction advanced by the majority that RP was somehow unaware of the actions of Trailhead LLC.

At bottom, the only discernible difference between RP and Trailhead LLC was a difference in ownership that evaporated before the plaintiffs lost the right to rescind their contracts based on the failure to provide a property report. Entanglement among these parties is profuse throughout the record. It is more intertwined than a wall of ivy. The same individuals who formed RP as a master developer for Wildhorse Meadows also planned every stage of the development (including Trailhead Lodge), obtained the relevant permits, directed marketing efforts for every stage of development (again including Trailhead Lodge), arranged for RP to sell the lot to Trailhead LLC, and signed all relevant documents for both entities. The two entities shared an office and all of their operations staff. The buyers of Trailhead Lodge, including one who spent two years as an employee of S & P marketing Trailhead Lodge and other Wildhorse Meadows development stages, did not know that RP and Trailhead LLC were separate entities. There is no basis in the record before us upon which anyone can reasonably conclude that RP was not "involved in some manner in the selling efforts." A fundamental fact remains: RP was an "indirect seller." For this reason,

I would reverse the judgment of the district court.